# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| MOUNTAIN VIEW HOSPITAL, L.L.C., an Idaho limited liability company, | Case No. 4:07-cv-464-BLW |
| Plaintiff, | |
| v. | **MEMORANDUM DECISION AND ORDER** |
| SAHARA, INC., a Utah corporation; DAVIS PARTNERSHIP, P.C., a Colorado corporation; JOHN DOES 1-10, | |
| Defendants. | |

SAHARA, INC., a Utah corporation,

      Cross Claim Plaintiff and
      Counterclaim Defendant,

v.

DAVIS PARTNERSHIP, P.C., a Colorado corporation,

      Cross Claim Defendant and
      Counterclaim Plaintiff.

SAHARA, INC., a Utah corporation,

      Third-Party Plaintiff,

v.

THE BALLARD GROUP, a Colorado corporation, UNITED TEAM MECHANICAL, LLC, a Utah limited liability company, E.K. BAILEY CONSTRUCTION, INC., a Utah corporation,

and ENCOMPASS SERVICES
CORPORATION, a Utah corporation,

       Third-Party Defendants.

_____

UNITED TEAM MECHANICAL, LLC, a
Utah limited liability company,

       Counterclaim Defendant and
       Third-Party Plaintiff,

v.

BINGHAM MECHANICAL, INC., an Idaho
corporation; DIAMOND TEST &
BALANCE, INC., a Utah corporation; and
SIEMENS, an Idaho corporation,

       Third-Party Defendants.

## INTRODUCTION

Before the Court are:  Motions for Summary Judgment by Defendant Encompass

Services Corporation (Encompass) (Dkt. 159), Third-Party Defendant The Ballard Group

(Ballard) (Dkt. 162), Third-Party Defendant Bingham Mechanical, Inc. (Bingham) (Dkt.

163), Third-Party Defendant E.K. Bailey Construction, Inc. (E.K. Bailey) (Dkt. 169),

Defendant Sahara, Inc. (Sahara) (Dkt. 225), Defendant Siemens Industry, Inc. (Siemens)

(Dkt. 257), Defendant United Team Mechanical, LLC (UTM) (Dkt. 292), and Defendant

Davis Partnership, P.C. (Davis) (Dkt. 297); Motions for Partial Summary Judgment by

Ballard (Dkt. 298), and Plaintiff Mountain View Hospital, LLC (Mountain View) (Dkt.

299); Motions to Strike by Encompass (Dkts. 280, 390), and Mountain View (Dkt. 352);

and a Motion to Supplement (Dkt. 331) by Siemens.

The matters are fully briefed and at issue. The Court heard oral argument on May 24, 2011. Having conducted a thorough review of the record before it, and after full consideration of the parties' written and oral arguments, the Court now rules as follows.[1]

## STATEMENT OF FACTS

In 1999, a group of Idaho doctors initiated the development of a specialty surgical hospital in Idaho Falls, Idaho. *Heywood Dec.*, Dkt. 304, ¶¶ 1-3; *Erickson Dec.*, Dkt. 303, ¶ 1. The doctors, with help from development firm ASC Group, formed two entities: Community Hospital Properties, LLC (to secure financing for the project), and Idaho Falls Community Hospital, LLC (to operate the facility). *Id.* In September 2001, after failed attempts to secure conventional financing, Idaho Falls Community Hospital formed a joint venture with Health Care Properties, Inc., to finance and own the facility. *Heywood Dec.*, Dkt. 304, ¶ 20; *Erickson Dec.*, Dkt. 303, ¶ 19. The facility was ultimately named Mountain View Hospital, and Idaho Falls Community Hospital, LLC changed its name to Mountain View, LLC. It is that latter entity which is the Plaintiff here.

## 1. Project Design and Construction

On September 14, 2000, Mountain View – through Community Hospital Properties – entered into a design-build contract with general contractor Sahara, Inc. Ex. A to *Counsel Dec.*, Dkt. 302-1. Under the design-build contract, Sahara agreed to

---

[1] To facilitate settlement and in acknowledgement that issuing a decision in this case had taken longer than usual, the Court issued an interim decision which set forth the Court's decision in summary fashion. Dkt. 398. However, that interim decision indicated that a more detailed final decision would follow. This Memorandum Decision and Order constitutes the promised final decision on all pending motions. Any variation from the Court's initial decision is specifically noted.

procure and manage architectural and engineering services, and furnish construction and administration of the work. Ex. A to *Counsel Dec.*, at Article 5.2, Dkt. 225-5. For architectural services, including designs and specifications for the project, Sahara subcontracted with Davis. Sahara hired The Ballard Group as the project's mechanical engineer, to prepare specifications, drawings, and plans for the project's mechanical systems, including its humidification systems. *Ballard Facts*, Dkt. 162-2, ¶ 4.

On November 9, 2001, Sahara subcontracted with Encompass to furnish and install all mechanical systems, including heating, ventilating, and air conditioning (HVAC), and plumbing systems. *UTM Facts*, Dkt. 193-1; Ex. 130 to *Taylor Dep.*, Ex. A to *Counsel Aff.*, Dkt. 159-4 at 12. Sahara subcontracted with E.K. Bailey to provide framing, drywall installation, insulation, and doors. Ex. H to *Counsel Aff.*, Dkt. 225-12. For all plumbing on the project, Encompass subcontracted with Bingham Mechanical. Ex. B to *Counsel Aff.*, ¶ 3, Dkt. 159-5. Encompass hired Siemens to furnish and install controls for the mechanical system. Ex. C to *Counsel Aff.*, ¶ 4, Dkt. 159-5. And to test and balance the system, Encompass hired Diamond Test & Balance. Ex. D to *Counsel Aff.*, ¶ 5, Dkt. 159-6.

## 2. Formation of UTM

On November 19, 2002, facing financial difficulties, Encompass filed for bankruptcy in the U.S. Bankruptcy Court for the Southern District of Texas. *Encompass Facts*, ¶ 11, Dkt. 159-2. Prior to Encompass filing for bankruptcy, a group of Encompass employees who worked on the Mountain View project decided to form a new business which would assume some of Encompass's contractual obligations. *Encompass Facts*, ¶

5, Dkt. 159-2. That business, United Team Mechanical (UTM) registered as a limited liability company on October 16, 2002. *Id.* Encompass entered into an agreement with UTM on November 14, 2002, to transfer assets and the trade name "Team Mechanical" to UTM. *Purchase &Sale Agreement*, Ex. J to *Counsel Aff.*, Dkt. 201-1. UTM agreed to pay $562,500, and to assume liabilities and obligations on behalf of Encompass. *Assum'n of Liab. Agreement*, Ex. K to *Counsel Aff.*, Dkt. 202-1.

## 3.    Humidification System Problems

From 2001 to November of 2002, Encompass performed work on the Mountain View project, including installation of in-duct humidifiers. On November 10, 2002, before completion of construction and before Mountain View was open to the public, the humidification system malfunctioned. *Webber Dep.*, Ex 235, Ex. F to *Counsel Aff.*, Dkts. 159-7, 159-8; s*ee Smith Dec.*, ¶ 5, Dkt. 220; *Fabrick Dec.*, ¶ 6, Dkt. 221. In November 2002, Mountain View had discussions with with Sahara, Encompass, and UTM, concerning problems with humidifiers leaking. Ex. I to *Counsel Aff.*, ¶ 10, Dkts. 200-1, 159-10. From November of 2002 through the start of 2005, UTM performed HVAC work on the project, including remediation and modification of the humidification system. *Smith Dep.*, Ex 59, Exs. H and N to *Counsel Aff.*, Dkts. 159-10 at 27, 159-13.

## 4.    Occupancy And Substantial Completion

A Temporary Certificate of Occupancy was issued on October 30, 2002. Ex. A to *Mills Aff.*, Dkt. 162-5. On January 15, 2003, Mountain View received its Certificate of Occupancy from the City of Idaho Falls. Ex B to *Mills Aff.*, Dkt. 162-6; *Webber Dep.* 89:7 – 92:20, Ex 238, Ex. F to *Counsel Aff.*, Dkt. 159-7. Also on January 15, 2003, UTM

acknowledged to Sahara by letter that UTM would honor the project's warranty per the Encompass Contract. *Smith Dep.*, Ex. 59, Ex. H to *Counsel Aff.*, Dkt. 159-10.

Between January 28, 2003 and March 13, 2003, Sahara transmitted all the as-built drawings for the Project to Mountain View. Ex M to *Counsel Aff.*, Dkt. 159-13. A final report by Diamond on the testing and balancing of the mechanical system was completed March 20, 2003. *Webber Dep.*, Ex. 103, Ex. F to *Counsel Aff.*, Dkt. 159-7.

On July 17, 2003, two certificates of substantial completion were signed by Jayson Newitt of ASC Group. Ex. J to *Counsel Aff.*, Dkt. 227-13. In a letter also dated July 17, 2003, Newitt noted acceptance and completion of "punchlist" items related to design of the project as of December 29, 2002, excluding humidification system and soffit/insulation. Ex. G to *Counsel Aff.*, Dkt. 223-8.

## 5. Problems After Occupancy

It is undisputed that, during the latter stages of construction, there were problems with the humidification system. "Daily rounds sheets" noting Mountain View's daily equipment readings, indicate that the steam boiler, which supplies steam to the humidifiers, was out of service over a dozen times in late winter to spring of 2005. *See Smith Dec.*, Dkt. 220; *Fabrick Dec.*, Dkt. 221; *Counsel Dec.*, Ex. C, Dkt. 222-3. Also, an April 7, 2005 letter from Mountain View to Sahara notes problems with the humidification system. Ex. D to *Counsel Dec.*, ¶ 5, Dkt. 222-4. In a July 4, 2005 letter to Mountain View, Scott Webber – Sahara's Project Manager for the Mountain View project – stated that work was done after April 7, 2005, relating to humidification system leaks, but the HVAC system was fully operational as of July 4, 2005. Ex. C to *Mills Aff.*,

Dkt. 162-7. Mountain View asserts that Sahara's work did not fix the humidification system. *Smith Dec.*, Dkt. 220; *Fabrick Dec.*, Dkt. 221.

There were also problems with the project's insulation. On January 19, 2004, Sahara's Scott Webber faxed a letter to E.K. Bailey, the framing subcontractor, saying that Sahara investigated and found areas with "small breaks in the insulation barrier," which they filled, but with which they were still "having problems." Ex. 2 to *Skinner Aff.*, Dkt. 172-2. In addition, the letter mentions problems with doors. *Id.* According to the Complaint, the main entry's auto sliding doors allowed cold air to infiltrate the main hospital lobby. Also, Davis contends that the soffits were not built according to Davis's drawings, and were inadequately insulated so that exterior air infiltrated interior spaces. *Erdmann Report*, Ex. 5 to *Counsel Dec.*, Dkt. 297-6.

Another concern was with the fire protection provided by the walls separating Mountain View's entry/exit vestibule from the first floor corridor. The walls were built to withstand fire penetration for one hour rather than two, as required by the applicable fire code. At issue is whether this deficiency is attributable to the walls' construction or design.

Finally, Mountain View alleges problems with Siemens' maintenance of the HVAC system, under post-occupancy maintenance agreements. Siemens entered into an agreement with Mountain View to maintain the installed control system, first from 2003-08, and then from 2008 to present. Exs. C and D to *Counsel Dec.*, Dkts. 257-9, 257-10. Mountain View asserts that Siemens has breached its agreements, noting – as evidence – that employees and visitors experience uncomfortably cold temperatures. *Counsel Dec.*

¶ 19, Dkt. 257-3.  Also, Mountain View contends that the building's energy usage dramatically exceeded Idaho energy codes, in violation of the maintenance agreements. Ex. E at 551 to *Counsel Dec.* ¶ 5, Dkt. 257-11.

## 6.      Procedural History

On October 26, 2007, Mountain View filed suit against Sahara and Davis, for breach of contract and negligence.  *Compl.*, Dkt. 1.  Mountain View settled with Davis and, in a sealed settlement agreement, agreed to indemnify Davis against claims by Sahara or other party to the lawsuit.  Sahara filed a cross-claim against Davis on July 7, 2008, asserting breach of contract, breach of the covenant of good faith and fair dealing, breach of warranty, negligence, and contribution and indemnity.  *Answer*, Dkt. 22. Sahara also filed its third-party complaint against Ballard and UTM for breach of contract, breach of the covenant of good faith and fair dealing, breach of warranty, negligence, and contribution and indemnity.  *Id.*

On July 30, 2008, Davis filed a counterclaim against Sahara, asserting breach of contract, breach of express indemnity, and contribution and equitable indemnity. *Answer*, Dkt. 33.

Mountain View filed an amended complaint on September 28, 2009, against Sahara, Davis, Siemens, and UTM, asserting breaches of contract and negligence.  *Am. Compl.*, Dkt. 97.  UTM filed a third-party complaint on September 29, 2009, against Bingham, Diamond, and Siemens, asserting indemnity and contribution.  *Third Party Compl.*, Dkt. 100.  On October 5, 2009, Sahara filed an amended third-party complaint against Ballard, UTM, Encompass, and E.K. Bailey, asserting breach of contract, breach

of the covenant of good faith and fair dealing, breach of warranty, negligence, and contribution and indemnity. *Am. Third Party Compl.*, Dkts. 101, 103.

The Clerk of Court entered an order of default against Diamond, on January 5, 2010. *Entry of Default*, Dkt. 133. On June 18, 2010, Encompass filed a cross claim against Bingham, Diamond, Siemens, and UTM, asserting contribution and indemnity. *Cross Claim*, Dkt. 152. Encompass filed an amended cross claim on July 8, 2010. *Am. Cross Claim*, Dkt. 153.

## LEGAL STANDARD

One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986).

The evidence must be viewed in the light most favorable to the non-moving party, and the Court must not make credibility findings. *Id.* at 255. Direct testimony of the non-movant must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999). On the other hand, the Court is not required to adopt

unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

The Court must be "guided by the substantive evidentiary standards that apply to the case." *Liberty Lobby*, 477 U.S. at 255. If a claim requires clear and convincing evidence, the issue on summary judgment is whether a reasonable jury could conclude that clear and convincing evidence supports the claim. *Id*.

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001)(en banc). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson,* 212 F.3d 528, 532 (9th Cir.2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in her favor. *Id.* at 256-57. The non-moving party must go beyond the pleadings and show "by her affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine issue of material fact exists. *Celotex,* 477 U.S. at 324.

However, the Court is "not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.,* 237 F.3d 1026, 1029 (9th Cir.2001) (quoting *Forsberg v. Pac. Northwest Bell Tel. Co.*, 840 F.2d 1409, 1418 (9th Cir. 1988)). Instead, the "party opposing summary

judgment must direct [the Court's] attention to specific triable facts." *Southern California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).

## ANALYSIS

**1.     Assignment of Design-Build Contract**

Mountain View and Sahara both seek summary judgment regarding whether Mountain View is a party to the design-build contract, as the assignee of Community Hospital Properties.  An assignment is "a transfer of rights or property from one person to another." *See Foley v. Grigg*, 164 P.3d 810, 813 (Idaho 2007).  For an assignment to occur, the assignor must manifest intent to transfer to an assignee the right to an obligor's performance.  *Purco Fleet Svcs, Inc. v. Idaho State Dept. of Fin.*, 90 P.3d 346, 351 (Idaho 2004).  The manifestation of intent to transfer may be made orally or through a written document, unless otherwise provided by statute or contract.  Restatement (Second) of Contracts §§ 324, 317 (1981).  Where an assignment is in dispute, there is a presumption in favor of assignment.  *TransWorld Airlines, Inc. v. American Coupon Exchange, Inc.*, 913 F.2d 676, 685 (9th Cir. 1990).

During construction, Sahara reported to several entities which represented the interests of Community Hospital Properties:  Health Care Properties, Inc., ASC, and The Boyer Group.  Under its contract with Community Hospital Properties, Sahara agreed to procure and manage – through subcontracts – architectural and engineering services for the construction project.  *See* Ex. A to *Counsel Dec.*, Dkt. 222-1.  Also, Sahara and Community Hospital Properties agreed that "warranties shall commence on the date of

Substantial Completion of the Work or a designated portion thereof." Ex. A to *Counsel Dec.* ¶ 2, Article 3.1.1, Dkt. 222-1.

When the project known as Idaho Falls Community Hospital became Mountain View, it was the owner's intent that Mountain View be assigned the design-build contract, as the project's developer. However, counsel for Mountain View acknowledged at hearing that there is no written documentation of the assignment to Mountain View from Community Hospital Properties. The parties have differing views of what was relayed to Sahara about the assignment. Mountain View maintains that Scott Webber admitted that he was apprised of the assignment. *See Mountain View Facts*, Dkt. 266 at 8-10; *Heywood Dec.*, Dkt. 304, ¶ 25; *Erickson Dec.*, Dkt. 303, ¶ 25; Ex. G to *Counsel Dec.* ¶ 8, Dkt. 265-7; Ex. G to *Heywood Dec.* ¶ 39, Dkt. 267-7 (letter of acknowledgment between Mountain View and Sahara). On the other hand, Sahara contends that it was unaware of the assignment. *Mabey Dec.*, Dkt. 322-7, ¶ 9). *Webber Aff.*, Dkt. 225-2.[2] However, it is apparently undisputed that Sahara accepted payment from Mountain View, rather than Community Hospital Properties, and that the latter entity was dissolved on October 5, 2001.

The question, then, is whether the unwritten assignment was valid, such that Sahara owed a duty of performance to Mountain View, in lieu of Community Hospital Properties.

---

[2] Sahara also notes that subcontractors Davis, UTM, Siemens, Ballard, E.K. Bailey, Bingham, Diamond Test & Balance, and Encompass executed conditional and unconditional releases identifying the owner of the project as Health Care Properties, Inc., not Mountain View. Ex. C to *Counsel Dec.*, ¶ 4, Dkt. 322-2.

The context for this dispute was provided by Ty B. Erickson and Bruce Heywood, both part of the group of doctors that formed Community Hospital Properties and (what eventually became) Mountain View. *Mountain View Mem.*, Dkt. 300 at 5; *Erickson Dec.*, Dkt. 303, ¶ 31; *Heywood Dec.*, Dkt. 304, ¶ 32. Erickson and Heywood's declarations explain that Community Hospital Properties was originally intended to build and own the hospital, and lease it to Mountain View. *See Erickson and Heywood Decs.* When Community Hospital Properties was no longer able to secure the necessary funding, alternative financing was pursued and secured through Health Care Properties, Inc., and Community Hospital Properties was administratively dissolved. According to Erickson and Heywood, it was the intent of Community Hospital Properties, Mountain View, and Health Care Properties, Inc., that Mountain View take over the design-build contract with Sahara from Community Hospital Properties.

Sahara does not challenge that Community Hospital Properties and Mountain View intended the assignment. Instead, Sahara argues that the assignment was not valid without the prior written consent of the parties to the contract. *Sahara Mem.*, Dkt. 225-1 at 9 (citing Ex. A to *Counsel Aff.* § 14.1, Dkt. 225-5 at 16). However, a non-assignment clause in a contract will not render ineffective an assignment intended by the assignor and assignee, but may entitle the obligor to damages for breach of contract. *Dennett v. Kuenzli*, 936 P.2d 219, 228 (Idaho 1997)(citing Restatement (Second) of Contracts § 322(2)). The contractual provision at issue here, requiring consent, is less restrictive than a non-assignment clause. Thus, it would seem to follow that Sahara may pursue

damages it may have incurred because of the assignment, but cannot invalidate the assignment intended between Community Hospital Properties and Mountain View.

In addition, the Idaho Supreme Court has held that, where parties to a contract agree that one party will not assign "without first obtaining the written consent" of the other party, that other party implicitly agrees to act reasonably and in good faith in exercising the right of approval. *Cheney v. Jemmett*, 693 P.2d 1031, 1034 (Idaho 1984) (citing *Mitsui & Co. v. Puerto Rico Water Resources Authority*, 528 F.Supp. 768 (D.P.R. 1981)). Sahara has not provided any reasonable basis for its withholding consent to the assignment, and the Court finds none.

Sahara is also estopped from asserting the invalidity of Mountain View's assignment from Community Hospital Properties. Quasi-estoppel applies "when it would be unconscionable to allow a party to assert a right which is inconsistent with a prior position." *Wilig v. Dept. of Health & Welfare*, 899 P.2d 969, 971 (Idaho 1995). As distinct from equitable estoppel, quasi-estoppel does not require "concealment or misrepresentation of existing facts on the one side, [and] no ignorance or reliance on the other." *Id.* (citing *Evans v. Idaho State Tax Comm.*, 540 P.2d 810, 812 (1975). Rather, quasi-estoppel "precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken by him." *KTVB, Inc. v. Boise City*, 486 P.2d 992, 994 (Idaho 1971).

It is also clear from the record that Sahara knew and acknowledged that Mountain View had assumed the design-build contract from Community Hospital Properties. For example, Scott Webber acknowledged in his deposition that he was aware the owner of

the design-build contract changed from Community Hospital Properties to Mountain

View. *Webber Dep.*, 281:7-16, Ex. E to *Counsel Dec.*, Dkt. 265-5. Also, in a September

5, 2001 letter from Sahara President R. Tim Howells to Health Care Property Investors,

Inc., and copied to Scott Webber, Mr. Howells wrote that Sahara, as the design-builder,

was "engaged by Mountain View Hospital, LLC . . . ("Developer"), to perform contract

work as part of the construction of the improvements on the premises." *Letter*, Ex. G to

*Counsel Dec.*, Dkt. 264-7. Although Sahara does not, by this letter, explicitly consent to

assignment, it identifies Mountain View as the developer with whom Sahara is contracted

to perform. This evidence demonstrates that Sahara had taken the position that Mountain

View was assigned the design-build contract from Community Hospital Properties. It is

undeniable that Sahara's position – that the contract was not assigned to Mountain View

– would be to Mountain View's detriment, as it would bar Mountain View's contract

claims against Sahara. The Court thus finds that quasi-estoppel applies to preclude

Sahara from challenging the validity of the assignment. Accordingly, the Court will

grant summary judgment to Mountain View and against Sahara on this issue.

Because the Court finds that Mountain View was assigned the design-build

contract, Mountain View is not precluded from recovering attorney fees as provided by

the contract. Thus, Sahara's motion for summary judgment denying Mountain View

attorney fees will be denied. As to Sahara's contention that fees should be denied

because fees against Sahara could not be segregated from fees and costs relating to the

other nine defending parties, the Court finds that Sahara's motion is premature. The

Court will therefore deny Sahara's motion regarding attorney fees against Mountain

View, but the Court's decision will not preclude Sahara from raising the issue when a request for fees is being considered by the Court.

**2.     Indemnification Of Encompass By UTM**

**A.     Scope of Agreements Between Encompass and UTM**

Encompass seeks summary judgment on its claim for indemnification by UTM. According to Encompass, the terms of its agreements with UTM provide that UTM assumed all liabilities, and agreed to indemnify Encompass, with respect to Encompass's contract with Sahara. UTM disagrees, asserting instead that its agreements to indemnify and assume liability for Encompass were more limited in nature.

The agreement between Encompass and UTM includes a series of contracts dated November 14, 2002 – a Purchase & Sale Agreement, an Assumption of Liabilities Agreement, and a General Subcontract & Collection Services Agreement. Under the contracts, UTM agreed to assume certain liabilities and obligations of Encompass, including performance of work under three types of contracts, identified as Schedule 3b, 3c, and 3d contracts. *Gen. Sub-Contr. & Coll'n Svs. Agreement*, Ex. L to *Counsel Aff.*, Dkt. 202-2.

Schedule 3b contracts included warranty work for which UTM was to be paid on a time and materials basis. Schedule 3c contracts included contracts in which UTM agreed to accept full liability. Schedule 3d contracts involved manufacturing jobs. The Mountain View contract is identified as a Schedule 3b contract, which requires warranty work, paid on a time and materials basis. *Counsel Aff.* ¶ 2, Dkt. 385. Under the General

Subcontract Agreement, UTM only accepted full liability for the contracts identified as Schedule 3c, which did not include Mountain View. *Id.*, ¶ 3.

On April 25, 2003, UTM and Encompass modified their obligations to each other by executing a Contract Assumption Agreement. *Contr. Assm'n Agreement*, Ex. Q to *Counsel Aff.*, Dkt. 206-1. Pursuant to the terms of the Contract Assumption Agreement, the $562,500 promissory note Encompass received as consideration for the Purchase & Sale Agreement was deemed settled in full; in consideration, UTM agreed "to provide the warranty and project services agreed in the [Purchase & Sale Agreement] and the agreements exhibited thereto as a reduction in the amount owing under the [promissory note]." *Id.*, ¶ 1. Also, Encompass agreed to sell, assign, transfer and convey to UTM, its right, title and interest in the Contracts, *id.*, ¶ 2, which were identified in Exhibit A to the agreement and included the Mountain View project. *Exhibit A*, Dkt. 206-1 at 9. UTM agreed to accept the assignment and discharge "all liabilities and obligations under the Contracts or related to the Work" on those contracts. *Cntr. Asmp. Agr.*, ¶ 2. UTM further "agree[d] and acknowledge[d] that those liabilities and obligations include[d], without limitation, claims for warranty work on the respective jobs, which may extend for a period of months past completion." *Id.*

In a separate paragraph entitled "Indemnification," UTM agreed to "indemnify and hold Encompass . . . harmless from all damages, liabilities, penalties, interest, expenses, fines, assessments, charges and costs, including without limitation reasonable attorneys' fees and court costs, related to the Contracts or the Work or resulting from UTM's breach of any provision of th[e] Agreement." *Id.*, ¶ 7. A paragraph titled

"Integration," provides that the agreement "supersedes all oral communications and prior written documents relating to the Contracts or the Work, including without limitation . . . any Contract Assignment Agreements and amendments thereto." *Id.*, ¶ 8. The parties agreed that the Contract Assumption Agreement would be contingent upon approval by the Bankruptcy Court, *id.*, ¶ 9, which was entered May 21, 2003. Ex. F to *Encompass Am. Crossclm.*, Dkt. 153 at 76-87.

UTM contends that the Contract Assumption Agreement cannot be construed to mean that UTM was assuming all of Encompass's contractual liabilities, since it would have involved assuming over 100 contracts and countless millions of dollars in potential liability. Such a reading, UTM argues, would make little sense. But whether UTM's agreement was wise or foolish is immaterial. Indeed, for Encompass to retain partial liability after selling its business and trade name to UTM and declaring bankruptcy, would be similarly illogical. The only issue before the Court, then, is whether the parties' contracts unambiguously provided that UTM agreed to assume full liability and indemnify Encompass.

Where a contract's terms are ambiguous, its meaning is a question of fact for trial. *Luzar v. Western Sur. Co.*, 692 P.2d 337, 341 (Idaho 1984). Whether a contractual term is ambiguous is a question of law to be determined by the court. *Clark v. St. Paul Property and Liability Ins. Companies*, 639 P.2d 454, 455 (Idaho 1981) (citation omitted). The Court finds no ambiguity here.

The "Assignment and Assumption" paragraph assigns to UTM "all of [Encompass's] right, title and interest in the Contracts identified in Exhibit "A," without

limitation or qualification. *Cntr. Asmp. Agr.*, Dkt. 206-1, ¶ 2. The Mountain View contract was clearly listed on Exhibit A. Under the paragraph titled "Indemnification," the Contract Assumption Agreement is similarly unqualified, providing that UTM will indemnify Encompass and hold it harmless from all damages and liabilities relating to the contracts. *Id.*, ¶ 7. The "Integration" paragraph states that the Contract Assumption Agreement supersedes all prior written documents, without exception. *Id.*, ¶ 8. This defeats UTM's argument that the parties intended – without supporting language – for the word "Contract" to refer only to one type of contract listed in Exhibit A. Although the prior General Subcontract Agreement distinguished between Schedule 3b, 3c, and 3d contracts, no such distinction survives in the Contract Assumption Agreement given the "Integration" provision in paragraph 8.

The Court finds that the unambiguous language of the contract requires UTM to fully indemnify Encompass, and assume all liability, with respect to the Mountain View project.

### B.    Effect of Bankruptcy Order

The Contract Assumption Agreement provides that the agreement is contingent on the Bankruptcy Court's approval. *Cntr. Asmp. Agr.*, Dkt. 206-1, ¶ 9. The Bankruptcy Court entered an order approving the agreement on May 21, 2003, specifically finding it "fair and reasonable under the circumstances." Ex. F to *Encompass Am. Crossclm.*, Dkt. 153 at 76-87, ¶ W. The Order also provides that, "[e]xcept as expressly permitted or otherwise specifically provided for in the [Contract Assumption] Agreement or this Order, the sale, transfer, assignment and delivery of the Assets to the Buyer under the

new Agreement shall not be subject to any lien, claim, encumbrance or other interest . . .." *Id.*, Dkt. 153 at 83-84.

UTM suggests that the language in the Bankruptcy Court's order absolves it of liability under the Mountain View contract because the Contract Assumption Agreement does not contain language expressly or specifically providing for such an encumbrance or claim.[3] UTM's position ignores the plain language of the agreement, which unequivocally provides that UTM accepts assumes and agrees to discharge liabilities and obligations under the Contracts identified in Exhibit A – which includes the Mountain View contract. *Cntr. Asmp. Agr.*, ¶ 2 (*see also* ¶ 7, providing that UTM will indemnify and hold Encompass harmless from liabilities related to the contracts identified in Exhibit A).

UTM contends that not all projects listed in Exhibit A are "Contracts," referencing the three schedule types identified in the General Subcontract Agreement. The Court rejects this argument for several reasons. First, the General Subcontract Agreement, while identifying three distinct obligation types (denominated in Schedules 3b, 3c, and 3d), refers to all three types as "contracts." Thus, under the General Subcontract Agreement's terminology, the word "contract" does not exclude 3b contracts such as Mountain View. Second, the Contract Assumption Agreement specifically provides that it "constitutes the entire Agreement between the parties and supersedes all oral

---

[3] In its responsive brief, UTM quotes this provision, but mistakenly cites to the May 28, 2003 Bankruptcy Court Order Confirming Encompass's Reorganization Plan, in the record as *Counsel Aff.*, Ex. I, Dkt. 159-11. *UTM Response*, Dkt. 193 at 12.

communications and prior written documents," without limitation.  *Cntr. Asmp. Agr.*, ¶ 8.

The effect of this provision is to eliminate – for purposes of the Contract Assumption

Agreement – the distinction which the General Subcontract Agreement made between 3b,

3c, and 3d contracts.

UTM contends that Encompass's claims for indemnification are an improper

collateral attack on the Bankruptcy Court's Orders.  However, the Court finds nothing

inconsistent between the Bankruptcy Court's Orders and the Contract Assumption

Agreement.  In the absence of such an inconsistency, the Contract Assumption

Agreement does not raise an issue of public policy concern; nor does it raise an issue of

preemption under federal bankruptcy law.  In light of the Court's findings, Encompass's

motion for summary judgment on the issue of indemnification by UTM will be granted.

UTM's motion on the same issue will be denied, as well as UTM's motion to discharge

its liability to Sahara on that basis.

### C.  Effect Of Indemnification On Claims By UTM and Sahara

In its motion for summary judgment, UTM asserts that, where the Court finds

UTM has assumed Encompass's liabilities as to the Mountain View project, as here, the

Court should also find that UTM has assumed Encompass's defenses.  The Ninth Circuit

has held that rights to indemnity and defense follow liabilities on a transfer of assets from

a manufacturing company to the purchasing corporation.  *Northern Ins. Co. of New York

v. Allied Mut. Ins. Co.*, 955 F.2d 1353, 1357-58 (9th Cir. 1992) (discussing *Ocean

Accident & Guar. Corp. v. Southwestern Bell Tel. Co.*, 100 F.3d 441 (8th Cir.), cert,

denied, 306 U.S. 658 (1939)).  The Court agrees and will grant UTM's motion for summary judgment on that issue.

Encompass moves to dismiss Sahara's claims of breach of warranty and indemnification against it.  Encompass argues that these claims are only valid against UTM, in light of UTM's assumption of rights and liabilities from Encompass regarding the project.  The Court's determination that UTM assumed Encompass's rights and liabilities for the project does not affect Sahara's claims against Encompass.  Rather, under the Court's finding, UTM must simply indemnify Encompass for Sahara's claims.  Accordingly, the Court will deny Encompass's motion as to these claims.

### D.    Encompass's Motion to Strike Van Taylor's Affidavit

Encompass moves to strike the Affidavit of Van Taylor, filed by UTM on April 25, 2011 (Dkt. 385), as untimely, prejudicial, and inadmissible.  UTM cites to the affidavit in support of its arguments that UTM did not assume the Mountain View project from Encompass through the Contract Assumption Agreement.  Despite UTM's reference to the affidavit in its response to Encompass's motion for summary judgment (*see UTM Resp.*, filed 11/29/10, Dkt. 193 at 8-9), UTM did not file the affidavit at that time.  Encompass noted the affidavit's absence in its response (Dkt. 321 at 12) to UTM's motion for summary judgment.  Ultimately, the affidavit was filed with UTM's reply brief and is now properly before the Court.   Because the Contract Assumption Agreement unambiguously provides that UTM assumed Encompass's obligations under the Mountain View contract, the Court did not find it necessary or appropriate to consider

the Van Taylor affidavit. Accordingly, Encompass's motion to strike the affidavit will be denied as moot.

**3.     Discharge of Claims Due to Encompass's Bankruptcy**

Because Encompass is entitled to indemnification by UTM with respect to Sahara's claims, the Court must consider the effect, if any, of Encompass's discharge in bankruptcy on Sahara's claims.

In bankruptcy proceedings, a debtor is required to file a list of all creditors known to the debtor, as well as a schedule of liabilities and assets. 11 U.S.C. § 521(1); *see In re Maya Const. Co.*, 78 F.3d 1395, 1398 (9th Cir. 1996). Based on this list, the bankruptcy court gives formal notice to all creditors, and advises how and by when to file a proof of claim. Fed. R. Bankr. P. 3002, 2002; *In re Maya Const.*, 78 F.3d at 1398-99. Failure to timely file a proof of claim may result in discharge, upon confirmation of the debtor's reorganization plan. 11 U.S.C. § 1141(d)(1)(A); *In re Maya Const.*, 78 F.3d at 1399.

On November 19, 2002, Encompass filed for bankruptcy protection in the Southern District of Texas under Chapter 11 of the Bankruptcy Code. *Encompass Facts*, Dkt. 159-2, ¶ 11. Encompass filed its joint plan of reorganization, which was confirmed by the bankruptcy court on May 28, 2003. *Confirm. Ord.*, Ex. I to *Counsel Aff.*, Dkt. 159-11. Encompass and UTM contend that Sahara's contract, tort and contribution / indemnification claims should be deemed discharged in bankruptcy.

Federal law determines when a claim arises under the Bankruptcy Code. *In re SNTL Corp.*, 571 F.3d 826, 839 (9th Cir. 2009). "It is well-established that a claim is ripe as an allowable claim in a bankruptcy proceeding even if it is a cause of action that has

not yet accrued." *Id.* In the Ninth Circuit, "a claim arises when a claimant can fairly or reasonably contemplate the claim's existence." *Id.*

For claims sounding in contract, "[i]t is within the fair contemplation of parties entering into a contract that the other party may breach it, or have made misrepresentations to induce the making of the contract." *In re Hassanally*, 208 B.R. 46, 53 (Bankr. 9th Cir. 1997) (quoting *In re Russell*, 193 B.R. 568, 571 (Bankr.S.D. Cal. 1996)). The court in *Russell* reasoned that this inclusive interpretation of claims best serves the Bankruptcy Code's policies, contemplated in 11 U.S.C. § 101(5). *Id.* Where substantial negotiation of a contract occurs before a bankruptcy discharge date, the contract will be deemed part of the bankruptcy estate, and thus discharged, even though the agreement was not reduced to writing until after the discharge date. *See In re Alan Dealey Litiq.*, 2008 WL 4153675 (E.D. Wash. Aug. 29, 2008).

Tort claims, such as claims for negligence, are discharged under 11 U.S.C. § 1141 where the conduct complained of occurs before discharge, even if the resultant injury occurs after discharge. *In re Grossman's, Inc.*, 607 F.3d 114, 125-26 (3rd Cir. 2010); *In re Worldcom, Inc.*, 339 B.R. 836, 840-41 (S.D.N.Y. 2006); *In re Edge*, 60 B.R. 690, 701 (Bankr. M.D.Tenn. 1986).

Sahara contracted with Encompass in November of 2001, roughly a year before Encompass filed for bankruptcy in November of 2002, and eight years before Sahara filed its claims against Encompass in October of 2009. Encompass asserts that it performed work on the contract before November of 2002, when it filed for bankruptcy. *Encompass Facts*, Dkt. 159-2, ¶ 7. The parties do not dispute this. Thus it appears that

Sahara had a relationship with Encompass before Encompass's bankruptcy petition was filed. The question is whether Sahara's relationship with Encompass was such that it was a "known creditor."

"Known creditor" implies that potential liability is reasonably ascertainable, not speculative or conjectural. *In re Drexel Burnham Lamber Group, Inc.*, 151 B.R. 674, 680-82 (Bankr. S.D.N.Y. 1993). Known creditors are entitled to direct notice of bankruptcy proceedings; those whose potential liability was not reasonably ascertainable need receive only notice by publication,. *In re: Arch Wireless, Inc.*, 534 F.3d 76, 80-81 (1st Cir. 2008); *In re Maya Constr.*, 78 F.3d at 1399.

Sahara was not listed as a creditor in Encompass's bankruptcy proceedings, and received notice by publication, rather than direct notice. *List of Creditors*, Ex. O to *Counsel Aff.*, Dkt. 227-18. Encompass acknowledged problems related to its work on the humidification systems for the Mountain View project on November 10, 2002, nine days before it filed for bankruptcy. *Encompass Facts* ¶ 7, Dkt. 159-2. However, this fact alone is insufficient to deem Sahara a known creditor. Except for the fact that Sahara ultimately named Encompass in this action, there are no other facts supporting that Encompass's potential liability – at the time Encompass filed for bankruptcy – was anything but speculative or conjectural. This is supported by the delay of nearly seven years, between discovery of humidification problems in November 2009, and the date when Sahara filed claims against Encompass.

The Court therefore finds that Sahara was not a known creditor, and was not entitled to direct notice. Accordingly, Sahara was given due notice, by publication, of

the bankruptcy proceedings.  It necessarily follows, that all of Sahara's claims against Encompass were discharged in bankruptcy.

The next question is whether UTM, as indemnitor for Encompass, enjoys discharge from liability due to Encompass's bankruptcy.  The Bankruptcy Court's orders reveal that UTM's liability under Encompass's contracts was expressly approved in the reorganization plan. *Bankr. Order*, Dkt. 159-11.  Specifically, the orders provide "that the Assigned Contracts shall, upon assignment to the Buyer, be deemed to be valid and binding and in full force and effect . . . notwithstanding any provision in any such Assigned Contract . . . that prohibits, restricts or conditions such assignment or transfer [sic], pursuant to section 365(k) of the Bankruptcy Code." *Id.* ¶ 14, Dkt. 159-11 at 8.  Also, "each Assigned Contract shall be free and clear of all Claims, . . . charges or other encumbrances, *except as specifically provided in the Purchase Agreement*." *Id.* ¶ 11 (emphasis added), Dkt. 159-11 at 7.

The Purchase and Sale Agreement between Encompass and UTM provides that UTM shall "[a]ssume, perform, and discharge from and after the Closing Date certain liabilities and obligations of [Encompass] pursuant to an Assumption of Liabilities Agreement." *Purch. and Sale Agr.*, Dkt. 201-1 at 3.  In the Assumption of Liabilities Agreement, UTM agrees "to perform and discharge" any Assumed Liabilities (identified in the attached Exhibit A), which include the Mountain View contract. *Assumption of Liab. Agr.*, Dkt. 202-1 at 2, 8; *see also Contract Assumption Agr.*, Dkt. 206-1.

UTM cites to a bankruptcy court decision from the Southern District of California in which a purchase of assets was deemed "free and clear" of claims filed prior to

bankruptcy, so that the buyer held such assets free of liability. *Myers v. United States*, 297 B.R. 774, 781 (S.D. Cal. 2003). In that case, plaintiff Myers sued the United States, and a number of defendant business entities, claiming negligence and injuries suffered due to toxins placed near plaintiff's home. *Id.* 297 B.R. at 777. However, unbeknownst to plaintiff, the defendant corporations had filed petitions for relief under Chapter 11 of the Bankruptcy Code six months earlier. *Id.* Between the time when plaintiff filed her lawsuit and when the defendant corporations petitioned for bankruptcy, defendant Shaw purchased the assets of the debtor corporations. *Id.* The bankruptcy court's order approving Shaw's purchase provided that the transfer of assets "will not subject Shaw to any liability" caused by the selling entity. *Id.* 297 B.R. at 779.

UTM's purchase agreement with Encompass is distinguishable from the sale in *Myers*. Here, UTM specifically assumed liabilities from Encompass, as contemplated in numerous agreements that were affirmed in the bankruptcy court's order. The Court therefore finds that UTM is not relieved of liability by virtue of Encompass's bankruptcy.

**4.      Economic Loss Rule**

In Idaho, "there is no duty to prevent economic loss to another" in the context of a tort action; thus recovery of purely economic losses on a negligence claim is prohibited absent an applicable exception. *Blahd v. Richard B. Smith, Inc.*, 108 P.3d 996, 1000 (Idaho 2005)(citation omitted). There are limited exceptions to the economic loss rule, including where there is a special relationship between the parties such that the duty to prevent economic loss arises out of equity. *Blahd*, 108 P.3d at 1000 (citing *Duffin v. Idaho Crop Imp. Ass'n*, 895 P.2d 1195, 1201 (Idaho 1995)). The Idaho Supreme Court

has applied the special relationship exception in only two situations: where the defendant is a professional or quasi-professional performing personal services, *Blahd*, 108 P.3d at 1000 (citing *McAlvain v. General Insur. Co. of America*, 554 P.2d 955, 958 (Idaho 1976)), and where defendant is an entity holding itself out as having expertise in a specialized function, *Blahd*, 108 P.3d at 1000 (citing *Duffin*, 895 P.2d 1195, 1201 (1995)). In both cases, the parties' relationship is such that plaintiff is induced to rely on defendant's performance. *Id.*

Here, Encompass, Bingham, E.K. Bailey, Sahara, and Siemens each raise the economic loss rule in their respective motions for summary judgment. E.K. Bailey raises the doctrine to preclude Sahara's claims against it. Encompass, Sahara, and Siemens raise the doctrine as to Mountain View's tort claims against Sahara. Bingham raises the doctrine regarding claims by Mountain View and Sahara against it.

### A.    Sahara's claims against E.K. Bailey

E.K. Bailey asserts that Sahara's claims against it are for purely economic damages, and thus the economic loss doctrine applies. Sahara seeks amounts it expended "in repairing or replacing workmanship or materials initially performed by [E.K. Bailey]." *First Am. Third Party Compl.*, Dkt. 103 at 8. These damages sought, E.K. Bailey argues, are "costs of repair and replacement of defective property," found to be precluded by the economic loss rule in *Aardema v. U.S. Dairy Systems, Inc.*, 215 P.3d 505, 510 (Idaho 2009). In response, Sahara concedes application of the economic loss rule, based on E.K. Bailey's admission of a contract between the parties. The Court thus

finds that the economic loss rule applies to preclude Sahara's claims for damages in tort, against E.K. Bailey.

**B.     The Special Relationship Exception Is Inapplicable To Sahara**

Mountain View asserts that the special relationship exception to the economic loss rule applies, because Sahara held itself out as a professional with specialized expertise in construction of medical facilities, and that Mountain View was thereby induced to rely on Sahara's performance. In *Duffin*, the Idaho Supreme Court found a special relationship between a farmer and the Idaho Crop Improvement Association, which certified seeds purchased by the farmer, and later found to be defective. *Duffin*, 895 P.2d at 1201. The court reasoned that the Association had "engaged in a marketing campaign . . . the very purpose of which [was] to induce reliance by purchasers" based on the seeds' certification. *Id.*

The professions characterized by the Idaho Supreme Court as falling within the special relationship exception include insurance agents, attorneys, architects, engineers, and physicians. *Blahd*, 108 P.3d at 1001 (citing *McAlvain*, 554 P.3d at 958). Finding that the special relationship applied to insurance agents, the court in *McAlvain* set forth the rationale of the special relationship exception, explaining that insurance agents are unique because they hold themselves out "as being experienced and knowledgeable in this complicated and specialized field." *McAlvain*, 554 P.3d at 958. The court further noted that an insured ordinarily and reasonably relies on the expertise of their insurance agent in handling their insurance problems. *Id.*

The Idaho Court of Appeals declined to expand the scope of the special relationship exception in *Nelson v. Anderson Lumber Co.*, 99 P.3d 1092 (2004). In *Nelson*, the court found finding that the defendant had engaged in negotiations, not with the plaintiff, but with an intermediate party, who then sold the materials in question to the plaintiff. *Id.* at 1101. Because the plaintiff in *Nelson* had no obligation to use the defendant's services, the facts failed to establish a special relationship between the parties, and the economic loss rule precluded relief in the plaintiff's negligence action. *Id.*

Here, Mountain View argues that Sahara should be characterized as a professional with experience and knowledge on which Mountain View reasonably relied. According to Mountain View, although southeastern Idaho contractors were considered for the project, Sahara was chosen based on its experience building medical facilities. *Vincent Dec.*, Dkt. 210-1; *Erickson Dec.*, Dkt. 210-2, ¶ 11. However, the Idaho Supreme Court has noted that, ". . . there is an extremely limited group of cases where the law of negligence extends its protections to a party's economic interest." *Duffin*, 895 P.2d at 1201. The Court finds that Mountain View's argument, if successful, would extend the exception far beyond the parameters suggested by the Idaho case law.

In *Duffin*, the plaintiff's reliance on defendant's specialized knowledge was for a single decision – the plaintiff's purchase of allegedly defective seed. Here, Mountain View did not rely on Sahara's asserted expertise for one fateful decision. Rather, Mountain View and Sahara entered into a detailed contractual relationship for services.

Sahara is also distinguishable from an insurance agent, or other profession referenced in *McAlvain*, whose expertise involves specialized training in a complicated field. As the court in *McAlvain* noted, insurance agents in the state of Idaho are required to be licensed under I.C. § 41-1030, to pass a state administered exam under I.C. § 41-1038, and to meet certain qualifications per I.C. § 41-1034. *McAlvain*, 554 P.2d at 958. Although Idaho requires licensure or certification for architects, electrical contractors, engineers, public works contractors, plumbers, and landscape architects, there is no such requirement for general contractors.

For the reasons set forth above, the Court concludes that no exception to the rule applies, and Mountain View's claims for economic losses due to negligence will be dismissed. The Court therefore need not address Sahara's claims to dismiss Mountain View's negligence claims against it based on the statute of limitations.

This, of course, does not resolve the question of whether Mountain View's negligence claims are for purely economic losses. "Economic loss includes costs of repair and replacement of defective property which is the subject of the transaction, as well as commercial loss for inadequate value and consequent loss of profits or use." *Salmon Rivers v. Cessna*, 544 P.2d 306, 309 (Idaho 1975). According to the deposition testimony of Mountain View representative James Gordon Adamson, Mountain View seeks damages for repair costs already or to be incurred, energy damages, and legal costs and fees. *Adamson Dep.* 77:7-80:18, Ex. O to *Counsel Aff.*, Dkt. 225-19. Mountain View does not challenge Sahara's assertion that Mountain View seeks purely economic damages. The undisputed evidence supports this conclusion.

For the foregoing reasons, the motions for summary judgment by Encompass, Sahara, and Siemens dismissing Mountain View's negligence claims against them will be granted. Bingham's motion will also be granted to the extent that UTM and Encompass[4] seek indemnification by Bingham for Mountain View's negligence claims against them.

## C.  Encompass's Motion to Strike Mountain View's Response

Mountain View filed a response (Dkt. 208) to Encompass's motion for summary judgment (Dkt. 159), challenging Encompass's arguments regarding the special relationship exception to the economic loss rule. Encompass moves to strike Mountain View's response, asserting that the declarations of Doctors Vincent and Erickson, on which Mountain View relies, include conclusory statements without factual support. *Encompass Objection*, Dkt. 261-3 at 4. In addressing the special relationship exception, the Court did not consider the Vincent or Erickson declarations, and as discussed above, the Court has concluded that the exception does not apply. Thus, Encompass's motion to strike (Dkt. 280) will be dismissed as moot.

## 5.  Statutes of Limitations for Breach of Contract Claims

Statutes of limitations bar plaintiffs from bringing already accrued claims after a prescribed time period. *See Rice v. Dow Chemical Co.*, 875 P.2d 1213, 1216 (9th Cir. 1994). The parties here raise a number of statutory limitation defenses. The Court first

---

[4] Although Bingham also identifies Sahara, Sahara has not named Bingham in its Amended Third Party Complaint (Dkt. 103), and appears to have no claims against Bingham.

addresses the statute of limitations with respect to breach of contract claims. Claims for indemnification and contribution will be addressed separately.

### A. Contract Claims Against Sahara

#### (1) *Contract between Mountain View and Sahara was not oral*

Sahara contends that where – as here – the Court finds a contractual relationship between two parties by virtue of an assignment of the design-build contract from Community Hospital Properties to Mountain View, then the Court should find that such contract was an implied or oral contract, subject to a four year statute of limitations under Idaho Code § 5-217. Under that statute, Sahara argues, the Court should find that Mountain View's contractual claims are barred. Under Idaho Code § 5-217, "an action upon a contract, obligation or liability not founded upon an instrument in writing" must be filed within four years. *Id.* Here, although the assignment from Community Hospital properties to Mountain View was undisputedly oral, the underlying "contract, obligation, or liability" was founded on a written instrument. The Court therefore rejects Sahara's argument that Idaho Code § 5-217 applies.

#### (2) *The statute of limitations for professional malpractice is inapplicable*

Ballard argues that Mountain View's claims against Sahara are barred by the two-year statute of limitations for professional malpractice under Idaho Code § 5-219(4). Notably, Ballard does not assert that Sahara's negligence claims against Ballard are similarly barred; that issue not being raised, the Court will therefore not address it. Professional malpractice involves a wrongful act or omission in the performance of

professional services, resulting in damage to the injured party, as determined through objective proof. I.C. § 5-219(4); *Lapham v. Stewart*, 51 P.3d 396 (2002); *Chicoine v. Bignall*, 835 P.2d 1293 (1992). The courts look to the substance of an action, rather than the form, in determining the appropriate statute of limitations to apply. *Nerco Minerals Co. v. Morrison Knudson Corp.*, 90 P.3d 894, 898 (Idaho 2004) (citation omitted).

Professional services, as contemplated under the statute for professional malpractice, are performed by one "licensed to perform such services under the law of the state of Idaho." I.C. § 5-219(4); *see Owyhee Cy v. Rife*, 593 P.2d 995 (1979) (finding that I.C. § 5-219 did not apply to accounting firm because, at time the work was performed, there was no statutory provision for licensing public accountants in Idaho). For professional malpractice to apply, the party against whom plaintiff seeks damages must hold the professional license, and not another to whom that responsible party sub-contracts work. *Owyhee*, 593 P.2d at 1013. The courts have hesitated to find that builder contractors meet the definition of professional, for purposes of malpractice. *Donnelly v. Rimar Construction, Inc.*, 2008 WL 4699283; *Twin Falls Clinic & Hospital Bldg. Corp. v. Hamill*, 644 P.2d 341 (Idaho 1982); *see also J.R. Simplot Co. v. Chemetics Int'l, Inc.*, 887 P.2d 1039 (1994) (in action by owner against designer/builder, statute of limitations under I.C. § 5-216 applied). Nor have the courts included work by all license holders in the definition of "professional services." *Sumpter v. Holland Realty*, 93 P.3d 680 (2004) (holding that real estate agents do not render "professional services").

It is undisputed that Sahara is a builder contractor, holding no professional license. The Court thus finds that the statute of limitations for professional malpractice does not

apply to Mountain View's claims against Sahara.  Accordingly, Ballard's motion for summary judgment against Mountain View and Sahara[5] regarding the statute of limitations will be denied.

### (3)   *The five year statute of limitations applies*

With respect to the written contracts here, the Court finds that the statute of limitations is five years from the date of breach.  I.C. § 5-216.  Where the contract claim arises "out of the design or construction of improvement to real property," the statute accrues and begins to run at the time "of final completion of construction of such an improvement."  I.C. § 5-241.

Sahara agrees that the accrual date, under Idaho Code § 5-241(b), was the date the final certificate of occupancy was issued, January 15, 2003.  *Sahara Facts*, ¶ 15, Dkt. 225-3.  Applying § 5-216, the limitation period for filing a contract claim against Sahara expired January 15, 2008.  Because Mountain View filed its Complaint against Sahara on October 26, 2007, prior to the statutory deadline, Sahara's motion for summary judgment on this issue will be denied.

### B.    Contract Claims Against Bingham

Encompass subcontracted to Bingham to supply and install medical gas piping and wet plumbing for the Mountain View project.  Ex. B to *Counsel Aff.* ¶ 3, Dkt. 159-5.  Encompass filed claims against Bingham for breach of contract and warranty on June 18,

---

[5] Ballard requests summary judgment dismissing Sahara's contribution claims against it, but offers no supporting argument or basis.  Absent such support, and in light of the Court's analysis of Ballard's motion as to Mountain View's claims against Sahara, the Court will deny Ballard's motion in its entirety.

2010. *Encompass Cr. Clm.*, Dkt. 152 (amended in Dkt. 153). Bingham now moves to dismiss those claims under the applicable statute of limitations for contract claims.[6]

The breach identified in Encompass's and UTM's contract claims against Bingham is Bingham's installation of L rather than K type piping. *UTM Third Party Compl.*, Dkt. 100; *Encompass Am. Cr. Clm.*, Dkt. 153. According to Bingham President, Rory Olson, Bingham completed installation of the piping, including requested modifications, sometime in late July 2002. *Olson Aff.* ¶¶ 9-11, Dkt. 166. Bingham completed its final item of work on the Mountain View project on November 22, 2002. *Id.* ¶14. The parties appear to agree that the Mountain View project was considered completed by all contractors on the date the City of Idaho Falls issued the final certificate of occupancy, January 15, 2003. *Cert. of Occupancy*, Ex. B to *Mills Aff.*, Dkt. 162-6.

Applying the same statutory provisions as for Mountain View's contract claims against Sahara, §§ 5-216 and 5-241, a party asserting breach of contract against Bingham for installation of L type piping, had until late July 2007 to file a claim. Or, evaluating the accrual date as the date when Bingham completed all aspects of its work, the five year limitation period would have run on November 22, 2007. Encompass did not pursue its claims against Bingham, which included contract as well as indemnity claims, until June 18, 2010, *Encompass Am. Cr. Clm.* (Dkt. 153), more than two years before any claim was brought against Bingham, and almost three years before Encompass filed its contract

---

[6] The parties appear to agree that the applicable statutes of limitations for Encompass's breach of warranty claim are Idaho Code §§ 5-241 and 5-216, for claims sounding in contract.

claim against Bingham. Encompass agrees with Bingham that the latest date when a contract claim accrued against Bingham was the Mountain View project's completion date, January 15, 2003, thus barring a contract claim against Bingham after January 15, 2008.

Encompass having conceded that they failed to timely file a breach of contract claim against Bingham, the Court will grant Bingham's motion for summary judgment on that issue. The applicability of the statute of limitations as to claims against Bingham for indemnity and contribution will be addressed later.[7]

### C. Contract Claims Against Encompass – The Statute of Limitations Defense Is Not Barred by the Doctrine of Equitable Estoppel.

Sahara subcontracted with Encompass to install mechanical systems for the Mountain View project. Ex. 130 to *Taylor Dep.*, Ex. A to *Counsel Aff.*, Dkt. 159-4 at 12. Sahara filed claims against Encompass sounding in contract on October 5, 2009. *Sahara Third Party Compl.*, Dkt. 102 (amended in Dkt. 103). Encompass argues that Sahara's contract claims against it are barred by the statute of limitations for contracts. As already discussed, the Court has concluded that Encompass's liabilities with respect to the Mountain View project were discharged in bankruptcy, but that the liability passed to UTM by virtue of Encompass's Contract Assumption Agreement with UTM. However, the Court finds that the statute of limitations bars Sahara's contract claims against Encompass.

---

[7] UTM did not pursue claims against Bingham, which were for indemnity and contribution only, until September 29, 2009. UTM Third Party Compl., Dkt. 100.

Courts apply the same statute of limitations analysis for breach of contract claims as for claims of breach of the covenant of good faith and fair dealing, which sound in contract. *Smith v. Meridian Joint Sch. Dist. No. 2*, 918 P.2d 583, 590 (1996) (violation of the implied covenant is a breach of the contract that does not give rise to a separate cause of action); *Idaho First Nat'l Bank v. Bliss Valley Foods, Inc.*, 824 P.2d 841, 864 (Idaho 1991) (unless specifically related to breach of the covenant, damages are not separate, because "[t]o hold otherwise would result in a duplication of damages awarded for breach of the same contract."). Neither party has asserted a different statute of limitations for Sahara's breach of warranty claim.

The same statutory provisions used to analyze Mountain View's contract claims against Sahara – Idaho Code §§ 5-216 and 5-241 – apply here as well. In short, a 5-year limitation period begins to run upon final completion of construction. There is no apparent dispute that the project was completed and the statute accrued when the final certificate of occupancy was issued on January 15, 2003. Sahara's claim was not filed until October 6, 2009, well after the limitations period had expired.[8]

In response, Sahara raises the defense of equitable estoppel. The Idaho Supreme Court has held that the only non-statutory bar to a statute of limitations defense is the doctrine of equitable estoppel. *J.R. Simplot Co. v. Chemetics Int'l, Inc.*, 887 P.2d 1039, 1041 (1995). Under that doctrine, one must show:

---

[8] It is unclear whether Sahara intends to withdraw its claims against Encompass on this Court's determination that UTM assumed Encompass's liability. Thus the Court addresses Sahara's opposition to Encompass's statute of limitations defense here.

(1) a false representation or concealment of a material fact with actual or constructive knowledge of the truth; (2) that the party asserting estoppel did not know or could not discover the truth; (3) that the false representation or concealment was made with the intent that it be relied upon; and (4) that the person to whom the representation was made, or from whom the facts were concealed, relied and acted upon the representation or concealment to his prejudice.

*Id.* (citations omitted). According to Sahara, it acted diligently in its efforts to pursue claims, but was thwarted due to Mountain View's failure to timely raise claims against Sahara, and UTM's denial of responsibility for work done before November 2002. In two footnotes, Sahara references Mountain View's failure to make a claim regarding medical piping until 2009, despite being aware of defects following occupancy. *Sahara Resp.*, Dkt. 227 at 6. But Sahara's analysis of equitable estoppel argument delves no further. The Court finds that Sahara has failed to establish any of the elements needed for equitable estoppel. Accordingly, the Court finds that Sahara's breach of contract claim against Encompass is barred by the applicable statute of limitations. Sahara's claims against Encompass for indemnification or contribution will be addressed later.

### D.      Contract Claims Against UTM

Encompass contracted with UTM to perform HVAC work on the Mountain View project, and the Court has concluded that UTM assumed Encompass's duties under its contract with Sahara for work on the Mountain View project. *See* Ex. 147 to *Taylor Dep.*, Ex. A to *Counsel Aff.*, Dkt. 159-4 at 64. Sahara filed a third party complaint against UTM for breaches of contract, the covenant of good faith and fair dealing, and warranty. *Sahara Third Party Compl.*, Dkt. 102 (amended in Dkt. 103). UTM now seeks summary judgment dismissing Sahara's contract claims against it, arguing that Sahara

lacks standing. Because the Court has found that UTM assumed Encompass's contract with Sahara, pursuant to UTM's Contract Assumption Agreement with Encompass, the Court finds that Sahara has standing. The court therefore rejects UTM's motion for summary judgment and dismissal against Sahara on that basis.

UTM also seeks summary judgment to dismiss the contract claims against it as barred under the statute of limitations. As discussed above, §§ 5-216 and 5-241, provides that contract claims, arising out of construction projects, are subject to a 5-year statute of limitations which begins to run upon final completion of construction. The same provisions apply for all claims sounding in contract, including claims for breaches of warranty and the covenant of good faith and fair dealing. In its response to Encompass's motion, Sahara does not dispute that the statute accrued when the final certificate of occupancy was issued – January 15, 2003. Sahara argues, as did Encompass, that equitable estoppel should bar application of the statute of limitations. As it did in analyzing Encompass's motion, the Court finds that the required elements for equitable estoppel are not satisfied.

Sahara filed its action against UTM on July 7, 2008, and against Encompass on October 5, 2009. Both these actions are beyond the statutory period for Sahara's contract actions, which expired January 15, 2008. Therefore, the Court finds that Sahara's contract claims against UTM, by virtue of UTM's assumption of Encompass's contract with Sahara, are barred by the statute of limitations. The Court will therefore grant UTM's motion for summary judgment on that issue.

### E.      Contract Claims Against E.K. Bailey

Sahara claims breaches of contract, warranty, and the covenant of good faith and fair dealing, against E.K. Bailey. *Sahara Am. Third Party Compl.*, Dkt. 102 (amended in Dkt. 103). Sahara subcontracted with E.K. Bailey to complete framing work, including installation of drywall, insulation, and doors for the Mountain View project. Ex. H to *Counsel Aff.*, Dkt. 225-12. According to E.K. Bailey, Sahara's contract claims against it accrued on the date of final completion of the project, when the final certificate of occupancy was issued – January 15, 2003. Sahara disagrees, arguing that a question of fact remains as to when the cause of action accrued. Where there is conflicting evidence regarding an action's accrual date, then a question of fact remains for trial. *Nerco Minerals Co. v. Morrison Knudsen Corp.*, 90 P.3d 894, 898 (Idaho 2004) (citation omitted).

Sahara contends that its damages were not discovered, and thus its claims against E.K. Bailey did not accrue, until Sahara was named in Mountain View's action on October 26, 2007. However, Sahara cites no authority for its proposition that the accrual date for its contract claims is tied to discovery of damages. As discussed above, absent a statutory bar – not raised here – the only bar to a statute of limitations defense is the doctrine of equitable estoppel. *J.R. Simplot Co.*, 887 P.2d at 1041. Sahara has not asserted any false representation or concealment, the first element required to show equitable estoppel, *id.*, nor does the Court find evidence of any. There being no factual basis for this element, the Court need look no further in determining that equitable estoppel is inapplicable. The Court finds no triable issue as to when Sahara's contract claims accrued. Because Sahara filed its action against E.K. Bailey on October 5, 2009,

more than five years after the accrual date of January 15, 2003, Sahara's contract claims against E.K. Bailey are barred. The Court will therefore grant E.K. Bailey's motion for summary judgment on that issue.

### F. Contract Claims Against Siemens

Mountain View alleges breach of contract against Siemens for Siemens' failure to maintain the hospital's HVAC system pursuant to a maintenance agreement between the two entities. *Am. Compl.*, Dkt. 97, ¶¶ 43-48. According to Siemens, the statute of limitations has run with regard to Mountain View's claim. Under Idaho Code § 5-216, the statute of limitations for the written contract entered into between Mountain View and Siemens is five years. Mountain View contends that, because the maintenance agreements are for continuing services, the statute cannot be said to have accrued on the first instance of breach, but accrues anew with each successive breach. The Court agrees that, given the nature of the agreement for continuing maintenance by Siemens, there is a disputed issue of fact as to when the statute of limitations accrued for Mountain View's breach of contract claim. Accordingly, the Court will deny Siemens' motion for summary judgment barring Mountain View's breach of maintenance agreement claim under the statute of limitations.

### 6. Statute of Limitations for Tort Claims – Negligence Claims Against Encompass And UTM

"Tort actions, if not previously accrued, shall accrue and the applicable limitation statute shall begin to run six (6) years after the final completion of construction of [ ] an improvement [to real property]." I.C. § 5-241(a). By indicating, "if not previously

accrued," the Idaho Legislature specifically provided for an exception to the normal accrual date of when construction is completed. Addressing § 5-241(a), the Idaho Court of Appeals stated that the statutory tolling period applies to latent defects, but not those defects that should have been, or were, discovered. *Hibbler v. Fisher*, 712 P.2d 708, 713 (Idaho Ct. App. 1985) (citing *Twin Falls Clinic & Hosp. Bldg. Corp. v. Hamill*, 644 P.2d 341, 345 (Idaho 1982)).

In its third party complaint against Encompass and UTM, Sahara claims that Encompass's installation of the humidification system in the Mountain View project was defective. *Sahara Am. Third Party Compl.* According to Encompass, the undisputed evidence shows that Encompass's alleged negligence was discovered by and known to Sahara, Mountain View, and UTM before completion of the project in January of 2003. Sahara, Encompass, and UTM each acknowledge that the leaking humidifiers were discovered on or around November 10, 2002, and discussed between representatives of Mountain View, Sahara, and UTM. *Sahara Facts*, Dkt. 159-2, ¶¶ 7-8; *UTM Facts*, Dkt. 193-1, ¶¶ 7-8; *Sahara Mem.*, Dkt. 227 at 12; *see also Letter*, Ex. G to *Counsel Aff.*, Dkt. 159-10 at 6.

Here, because the relevant parties acknowledged discovery of the humidifier leaks in November 2002, the six year tolling period does not apply. Instead, the Court looks to Idaho Code § 5-224, which provides that "[a]n action for relief not hereinbefore provided for must be commenced within four (4) years after the cause of action shall have accrued." Under that provision, the accrual date for Sahara's negligence claims against Encompass and UTM was on discovery of the humidifier leaks in November 2002.

*Hibbler*, 712 P.2d at 713.  Sahara therefore had until November of 2006 to file its negligence claims.  Because Sahara did not file its claims until October 6, 2009, they are barred.  The Court will grant Encompass's and UTM's motions for summary judgment dismissing Sahara's negligence claims against them.

**7.     Statute of Limitations for Indemnity and Contribution Claims**

Encompass argues that Sahara's claims against it for the negligence by Bingham, Siemens, or Diamond, are barred by the statute of limitations.  Encompass must indemnify Sahara for performance by Bingham, Siemens, or Diamond, both under its subcontract with Sahara, and because Sahara has no contractual relationship with those three entities.  Thus, the appropriate statute of limitations analysis is for indemnification.

**A.     Sahara's Indemnity Claims Against Encompass, E.K. Bailey, and UTM**

Encompass, E.K. Bailey, and UTM seek summary judgment, dismissing Sahara's claims for indemnification, arguing that Sahara failed to pursue adequate and complete remedies at law – namely contract and negligence claims.  As discussed above, Sahara's underlying claims for breach of contract and negligence are barred by the applicable statutes of limitations.  As a result, Encompass, E.K. Bailey, and UTM contend that Sahara is precluded from pursuing equitable relief for indemnity claims under *Farmers Nat. Bank v. Wickham Pipeline Const.*, 759 P.2d 71, 74 (Idaho 1988).

In *Wickham*, the plaintiff sought indemnity to recover "for defective pipe furnished by [the defendant] . . .."  *Id.*  The court there determined that the plaintiffs passed up a direct legal cause of action for which they could have been made whole, then belatedly pursued an indemnity claim in equity.  *Id.*  The *Wickham* court concluded that

equitable relief could not be granted to the plaintiffs because "the award of damages at law was adequate to protect the interests of the injured party." *Id.* (citing Restatement (Second) of Contracts § 359 comment a (1981)); *see also Parker v. Winnipiseogee Lake Cotton & Woolen* Col, 67 U.S. (2 Black) 545, 551 ("suits in equity shall not be sustained . . . in any case where plain, adequate and complete remedy can be had at law" (citation omitted)). *Id.*

The *Wickham* court determined that, where absolute language in a statutory limitation provision indicates legislative intent to afford ultimate repose, such specific provision will control over a more general statute of limitations, agreeing with the Utah Supreme Court in *Perry v. Pioneer Wholesale Supply Co.*, 681 P.2d 214 (Utah 1984). *Id.* at 76. Finding that such legislative intent was present, the *Wickham* court pointed to statutory language "prohibiting the parties from extending the limitation period by agreement." *Id.* (citing I.C. § 28-2-725(1)). That court further noted that applying the more general indemnity rule – that the statute of limitations does not begin to run until liability attaches to the indemnitee – "would contradict the legislature's specific directive." *Id.* at 76-77.

This case is distinguishable from the facts in *Wickham* and *Perry.* In *Wickham*, the plaintiff's indemnity claim arose out of the sale of goods covered by the Uniform Commercial Code, Idaho Code § 28-2-725. Here, § 5-241 – regarding actions arising out of the design or construction of improvement to real property – applies. The language of this provision, for both tort and contract actions, does not imply a legislative intent to afford ultimate repose, as did § 28-2-725 – the limitations statute discussed in *Wickham*.

Nor is such an intent indicated by the language of § 5-216, which sets the limitation period for contracts at five years.

Sahara asserts that the general rule for accrual of indemnity claims applies – that "the time from which the statute of limitations . . . begins to run is when the underlying claim, judgment, or settlement is paid or discharged." *Shiess v. Bates*, 693 P.2d 440, 442 (Idaho 1984) (citing *May Trucking Co. v. Int'l Harvester Co.*, 543 P.2d 1159, 1162 (Idaho 1975)). The Court agrees. The contract and tort claims here are not governed by the Uniform Commercial Code, nor is there any indication from the Idaho legislature or courts that indemnity claims arising out of improvements to real property be cut off even where they have not technically accrued. The Court thus concludes that Sahara's indemnity claims against Encompass, UTM, and E.K. Bailey have yet to accrue, and are not barred by the applicable statutes of limitation.

### B.      Claims Against Bingham for Indemnity

Bingham also cites *Wickham*, arguing that UTM's and Encompass's indemnity claims against Bingham are barred by the statute of limitations. However, *Wickham* is distinguishable, for the reasons stated in its discussion above – the statute of limitations for indemnity claims begins to run "when the underlying claim, judgment, or settlement is paid or discharged," per the holding in *Shiess*, 693 P.2d at 442. On that basis, the Court finds that the statute of limitations does not bar UTM's and Encompass's indemnity claims against Bingham. The Court will address Encompass's argument regarding discovery of the alleged defect in the piping used by Bingham in its discussion of waiver, laches, and estoppel, below.

**8.     Waiver, Laches, and Estoppel**

To demonstrate laches, one must show:  (1) that defendant has invaded plaintiff's rights; (2) that plaintiff had notice and opportunity to initiate a suit but has delayed doing so; (3) that defendant was unaware plaintiff would assert his rights; and (4) injury or prejudice to defendant if plaintiff's suit is not barred.  *Henderson v. Smith*, 915 P.2d 6, 11 (1996).

As discussed earlier in this decision, quasi-estoppel precludes a party from asserting a right, to another party's detriment, that is inconsistent with a position previously taken.  *KTVB, Inc. v. Boise City*, 486 P.2d 992, 994 (Idaho 1972).

Waiver is "the intentional relinquishment of a known right . . . a voluntary act [that] implies election by a party . . . to forego some right or advantage which [the party] might . . . have demanded and insisted upon."  *Hecla Mining Co. v. Star Morning Mining Co.*, 839 P.2d 1192, 1196 (Idaho 1992) (quoting *Crouch v. Bischoff*, 304 P.2d 646, 649 (1956)).  A party asserting waiver "must have acted in reliance upon the waiver and altered the party's position."  *Hecla*, 839 P.2d at 1196 (citing *Brand S Corp. v. King*, 639 P.2d 429, 432 (1981)).

**A.     Claims Against Bingham**

Bingham moves for summary judgment against Sahara, Encompass, and UTM dismissing contract and warranty claims against it under the doctrines of laches, waiver, and quasi-estoppel.  The contract and warranty claims against Encompass concern Encompass's departure from specifications in the type of gas piping installed, and the method of joining vacuum piping for the Mountain View project.

Before Bingham submitted its bid to perform plumbing for the Mountain View project, Encompass had discussed with Sahara ways to reduce costs and thereby address budgetary concerns. *Olson Aff.* ¶ 4, Dkt. 166; *Bingham Facts* ¶ 2, Dkt. 163-1. Based upon its conversations with Sahara, Encompass proposed to Bingham that type K piping be replaced with less expensive type L piping. *Id.* In his deposition, Mountain View[9] expert Michael Locke testified that type L is more commonly used than K, for gas piping in hospitals. *Locke Dep.* at 1164, Ex. B to *Counsel Aff.*, Dkt. 165-2 at 3. It is undisputed that, although these changes departed from the project's specifications, they were acceptable per applicable building codes. According to Bingham, Encompass agreed to the substitution; Bingham therefore installed type L piping, and informed Encompass and Sahara that it would do so. *Id.*

Encompass disputes that it requested or approved any bid with L piping, noting that Bingham's bid included a detailed quote for piping at $28,000 and listed "type K hard" piping material. *Second Counsel Aff.*, Ex. B, Dkt. 213-4 at 7. Encompass estimator Rick Robinson, in charge of soliciting bids for plumbing work on the project, does not recall requesting or telling Bingham that because of budgetary concerns, it should use type L piping, rather than the type K piping called for in the plans and specifications. *Robinson Aff.*, ¶ 2, Dkt. 213-2. Sahara also denies knowledge that Bingham's use of type L piping was approved. *Sahara Facts*, Dkt. 224-2.

---

[9] Mountain View's Initial Complaint, dated October 26, 2007, identifies 6 defects in the project: (1) HVAC design and/or installation; (2) insufficient insulation; (3) improper windows; (4) deficient framing; (5 and 6) improperly functioning humidifiers and cooling system in imaging areas. The Complaint did not identify deficiencies in medical gas piping.

Bingham began work on March 2, 2002, and completed installation of gas piping on June 18, 2002. *Olson Aff*, Dkt. 166. On June 26, 2002, Ballard reported to Sahara that Bingham installed type L copper medical gas piping, rather than type K as required in plans and specifications. Ex. F to *Counsel Aff.*, Dkts. 159-8, 159-9. Ballard also reported that Bingham installed vacuum piping with soldered joints rather than brazed joints. *Id.* As with the L piping, the soldered joints were acceptable under the applicable building code, even though they departed from specifications. Encompass disputes that it received or was made aware of Ballard's report, noting there is no indication of whom the report was sent to. *Encompass Facts*, Dkt. 213-1.

In its motion for summary judgment, Bingham argues that Sahara, Encompass, and UTM are barred from all contract and warranty claims against Bingham by the doctrines of laches, waiver, and quasi-estoppel. Because Sahara has made no claims against Bingham, none of the doctrines apply, and Bingham's motion will be denied as to Sahara.

Both Encompass and UTM claim only contribution and indemnity against Bingham. Bingham raises defenses of laches, waiver, and quasi-estoppel against Encompass, as the entity with whom it contracted to do the work, and against UTM, as Encompass's successor. *Bingham Mem.*, Dkt. 164 at 4. Regarding UTM, it is undisputed that UTM's role on the project was limited to "post-construction warranty work." *UTM Resp. to Encompass*, Dkt. 193 at 19; *UTM Facts* ¶¶ 11, 20, Dkt. 193-1. According to UTM, it was unaware that Bingham had installed L piping or had soldered joints. Bingham does not dispute this. Thus, Bingham cannot establish that UTM had notice and

an opportunity to take action, and its laches defense fails.  Also, Bingham cannot show

that UTM is asserting a right inconsistent with a prior position, thus its quasi-estoppel

defense fails.  Finally, absent UTM's knowledge of its right, it cannot have waived it;

thus Bingham's waiver defense also fails as to UTM.

As to Encompass's claims against Bingham, the first element of Bingham's laches

defense is not in dispute; the asserted "invasion of rights" was Bingham's installation of

type L piping rather than type K piping, and use of soldered rather than brazed joints.

With respect to the second element, the evidence supports that Bingham was not sued

until roughly seven years after it completed installation of piping on the project; the Court

finds that this qualifies as a delay for purposes of its analysis here.  Also, the Court finds

that Bingham would be prejudiced by having to defend against these claims, if laches is

not applied, thus satisfying the fourth element.

The Court must still consider the second part of the second element for a laches

defense – whether Encompass had notice of the "invasion of rights" and the opportunity

to take action.  This question is similar to a requirement of quasi-estoppel – that

Encompass is asserting a right inconsistent with a prior position – and to a requirement of

waiver – that Encompass relinquished a known right.

A Site Observation Report dated June 26, 2002, addressed type L piping.  *Site

Observ. Rept.*, Ex. 165 to *Webber Dep.*, Dkt. 165-1 at 17-28.  However, it is unclear in

the record whether Encompass received the report.  *Encompass Resp.*, Dkt. 213 at 4.

Also, paperwork concerning Bingham's bid seems to support that type K piping would be

used.  *Id.* at 5.  In the various affidavits provided by Encompass, no affiant actually

denies receiving the report; rather, they attest to a lack of proof that Encompass *did* receive the report. *Bingham Reply*, Dkt. 240 at 11.

On motions for summary judgment, the moving party has the burden of proving the absence of a genuine issue of material fact. *Devereaux*, 263 F.3d at 1076. Also, evidence must be viewed in the light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255. The Court finds that the disputed evidence as to Encompass's notice of Bingham's invasion of rights is more than a mere "metaphysical doubt as to the material facts," although perhaps only incrementally so. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Accordingly, the Court finds that there are disputed issues of fact as to whether the laches defense is available. Also, absent Encompass's awareness of the violation, Bingham cannot establish that Encompass is asserting a right inconsistent with a previous position; thus Bingham's quasi-estoppel defense fails. Finally, Bingham's defense of waiver also fails because there remains a dispute as to whether Encompass intentionally relinquished a known right. As to its defenses of laches, waiver, and quasi-estoppel, Bingham's motion for summary judgment will be denied. *Change Order Docs.*, Ex. A to *Olsen Aff.*, Dkt. 166-1 at 11-12.

### B.  Waiver As To Mountain View's Breach of Contract Claim Against Siemens For Excessive Energy Costs Incurred

Mountain View claims that it incurred excessive energy costs from 2003 through 2009, following Siemens' installation of the control systems for the Mountain View project, and due to Siemens' breach of its maintenance contract. *Am. Compl.*, Dkt. 97, ¶¶ 43-48. According to Siemens, it provided multiple mechanisms for checking and

understanding its work, but neither Mountain View nor Sahara pursued verification of system compliance prior to 2009. *Ex. B to Counsel Dec.* at MVH 006713-14, Dkt. 257-7 at 15-16. However, it is unclear whether Mountain View or Sahara were adequately notified of the commissioning process. *Locke Report*, Ex. H to *Counsel Dec.*, ¶ 8, Dkt. 257-22. According to Locke, the commissioning reports were incomplete, the customer acceptance form was mysteriously absent, and there were no initials from a Siemens technician on the forms. *Id.*

Upon Mountain View's request for technical assistance in 2009, Siemens provided a technician to meet Mountain View's expert, Michael Locke, to review the system. *Siemens Facts*, Dkt. 257-2 at 17. Mr. Locke provided a report detailing alleged deficiencies in the controls, which were claimed to be the source of excessive energy costs. *Locke Report*, Ex. H to *Counsel Dec.*, Dkt. 257-22. According to Siemens, by failing to request technical assistance earlier, Mountain View waived its right to assert energy damages allegedly incurred before its initial request amounting to programming.

Mountain View counters that the "As-Built" drawings provided by Siemens are very technical, and not readily understood by a layperson; thus Mountain View cannot be said to have *known* of, but intentionally relinquished, a right upon which it could have insisted – as required for waiver. Also, according to Mountain View, Siemens had the duty to verify that control systems were properly commissioned and maintained, under the specification prepared by Ballard. *Specification*, Ex. B to *Counsel Dec.* (see ¶ 2), Dkts. 257-5 to 257-8. Given the evidence presented, the Court finds that genuine issues of material fact remain whether Mountain View had notice of its rights so as to satisfy

laches, waiver, or quasi-estoppel.  Siemens' motion for summary judgment as to these defenses will therefore be denied.

### C.    Express Waiver As to Mountain View's Claims Against Siemens

Siemens also moves for summary judgment dismissing Mountain View's claims against it for breach of their maintenance agreement, as barred by express waiver.  Under Mountain View's first maintenance agreement with Siemens, in effect from 2003 to 2007, the parties agreed that Siemens "shall in no event be responsible . . . for incidental, consequential, punitive, exemplary or special damages . . .." *First Maint. Agr.*, Ex. C to *Counsel Dec.* at SBTI000398, Dkt. 257-9 at 10.  Under the second agreement, in effect through 2009, the parties agreed that "in no event shall either party be responsible under this Agreement for incidental, consequential, punitive, exemplary or special damages . . .." *Second Maint. Agr.*, Ex. D to *Counsel Dec.* at SBTI000329 - 000330, Dkt. 257-10 at 15.

Mountain View counters that the entire purpose of the maintenance agreements was "to ensure the Hospital's HVAC systems operated at peak efficiency and to lower [Mountain View's] energy costs." *Mountain View Resp.*, Dkt. 287 at 12.  Mountain View cites sections of the agreement providing that Siemens offers the maintenance agreement "[i]n order to maintain that high degree of efficiency and operating stability . . . [through] semi-annual visits designed to ensure peak functionality." *First Maint. Agr.*, Ex. C at SBTI000391.  Also, Siemens agreed to "address any programming errors, failed points, points in alarm, or points in operator priority . . . [to] increase system efficiency, assure compliance to specified conditions, and reduce the risk of costly and disruptive system

problems." *Id.* at SBTI000393.  Siemens further represented that "[i]n addition, our trained Specialists will optimize the system software so it performs at peak efficiency as well." *Second Maint. Agr.*, Ex. D at SBTI000318.

The first question is whether the purpose of the agreements was to maintain efficiency in the hospital so as to avoid the energy costs ultimately incurred by Mountain View.  If that was indeed Mountain View's purpose, then arguably its damages from excessive energy costs resulted directly from, rather than incident or consequent to, Siemens' alleged breach of the maintenance agreements.  Siemens argues that Mountain View's reading of the agreements – promising a maximum level of energy use – amounts to a "performance contract" that would have required complex measurement and verification systems; according to Siemens, such a guarantee regarding energy performance would be absurd.  However, Siemens acknowledges that, according to Locke, Mountain View hospital's energy usage "dramatically" violated energy efficiency standards per Idaho law.  *Siemens Reply*, Dkt. 326 at 7.  The next question is whether a triable issue remains as to the damages from excessive energy can be quantified and measured so as to determine a breach of performance.   The Court finds that genuine issues of material fact remain regarding this question, and will therefore deny Siemens' motion for summary judgment barring Mountain View's claims under the defense of express waiver.

### D.    Express Waiver Of Damages From UTM's Alleged Breach Of Preventative Maintenance Contract Claim With Mountain View

UTM seeks summary judgment dismissing Mountain View's claims against it for breach of UTM's preventative maintenance contract, on the grounds that the claim is barred by express waiver. Under the maintenance contract, UTM is not liable "for business interruption losses, lost profit, or consequential or punitive damages." *UTM Mem.*, Dkt. 292-1 at 18. UTM is liable for any "negligence . . . in performance or failure of performance of its obligation under th[e] agreement." *Id.* According to UTM, Mountain View's request for damages from breach of its maintenance contract is a request for consequential damages that was expressly waived by the terms of the contract, rather than direct damages for which UTM agreed it would be liable.

Notwithstanding the legal distinction between consequential and direct damages, there remain issues of fact regarding the parties' intentions and understanding as to the maintenance contract's waiver provisions. Accordingly, UTM's motion to dismiss Mountain View's breach of maintenance contract claim against it under a theory of express waiver will be denied.

### E. Waiver, Quasi-estoppel, and Laches, As To Mountain View's and Sahara's Claims Against UTM

Mountain View and Sahara have made claims against UTM for damages relating to the mechanical systems in the Mountain View project. In moving for summary judgment, UTM argues that those claims are barred by waiver, quasi-estoppel, and laches. In support, UTM cites to a letter dated August 3, 2005, from Mountain View's Chief Operating Officer Mark Harrison, to Sahara, indicating that the humidification system was acceptable. Although UTM's statement of facts and affidavit of counsel

reference the letter (as Exhibit W to *Counsel Aff.*), it does not appear to have been attached or otherwise filed with the Court.  Even so, Mountain View denies that the letter (apparently a draft) was ever sent to its intended recipient – Sahara, let alone to UTM. *Mountain View Resp.*, Dkt. 356 at 7.  The Court finds that a genuine issue of material fact remains as to whether Mountain View or Sahara had notice or knowledge of a right that they intentionally relinquished.  Thus, a triable issue remains that is necessary to establish the second element of laches, and the requirement of knowledge for waiver.  A triable issue also remains whether Mountain View and Sahara are asserting rights inconsistent with prior positions, required to establish quasi-estoppel.  Accordingly, the Court will deny UTM's motion regarding these defenses.

### 9.     Davis's Motion As To Sahara's Claims

Mountain View's Amended Complaint claimed that Sahara and Davis were liable for alleged defects in the design and construction of the Hospital.   Sahara filed a Cross-Claim against Davis seeking damages under a variety of legal theories.  However, Sahara's only claims for relief are in the nature of indemnity, and seek the recovery of any amounts for which Sahara may be found liable to Mountain View because of actions for which Davis is found responsible, plus any costs and attorneys' fees incurred in defending against Mountain View's claims.

On December 8, 2010, Mountain View entered into a settlement agreement with Davis which released its claims against Davis, as well as claims against Sahara for any negligence, breach, or fault of  Davis. *Settlement Agr.* (Sealed) at ¶¶ 4, 7, Ex. 7 to *Counsel Aff.*, Dkt. 297-7.  In light of the settlement agreement, Davis moves for summary

judgment dismissing Sahara's cross-claims against it. In the alternative, Davis moves for summary judgment dismissing Sahara's claim for liability derived from Davis, and to limit Davis's liability for Sahara's defense costs.

Davis argues that its request to limit liability for Sahara's defense costs is a legal issue on which the Idaho courts have spoken. The general rule in Idaho, regarding indemnity actions, is that "there is no right to recover attorney fees incurred for defending against the indemnitee's own fault." *Chenery v. Agri-Lines Corp.*, 766 P.3d 751, 758 (Idhao 1988) (citing *Borchard v. Wefco, Inc.*, 733 P.2d 776 (Idaho 1987) and *Weston v. Globe Slicing Machine Co.*, 621 F.2d 344 (9th Cir. 1980) (applying Idaho law)). An indemnitee "must bear its own costs of defending itself against claims which allege that it was at fault, even if the trier-of-fact absolves the [indemnitee] of liability." *Borchard*, 733 P.2d at 779.

"[T]he mere allegations in a complaint do not dictate whether indemnity will be allowed . . .." *Meldco, Inc. v. Hollytex Carpet Mills, Inc.*, 796 P.2d 142, 149 (Idaho Ct. App. 1990) (citations omitted). Instead, the determination of attorney fees and costs "should be made upon the findings of the trier of fact." *Id.* But here, Davis's settlement with Mountain View answers any factual question that might arise at trial with respect to liability owed by Davis to Sahara. As to whether Sahara is responsible for any claims based on Davis's liability, the answer is no. Because Sahara's claims against Davis are limited to those derived from Davis's liability, no factual issues remain for trial, and summary judgment is appropriate. The Court will therefore reconsider its decision on this issue from its Order (Dkt. 398), and will now grant Davis's motion, dismissing

Sahara's claims against Davis, as well as any claim by Sahara for defense costs associated with those claims.

## 10. UTM's Motion Regarding Indemnification By Bingham, Siemens, And Diamond

In seeking summary judgment on its indemnification claims against Bingham, Siemens, and Diamond, UTM points only to the language of the subcontracts between Encompass and those subcontractors. Those subcontracts provide that the subcontractor "shall indemnify, hold harmless and defend" Encompass, Sahara, Mountain View, and Davis "from and against all claims, damages, losses and expenses, including but not limited to attorney's fees, arising out of or resulting from the performance of [the subcontractor's work] . . .." *Subcontracts*, Exs. C, D, E to *Counsel Aff.*, Dkts. 196-1 to 196-3. Such provisions clearly provide a right of indemnification according to their terms. However, notably, the subcontracts contain a qualifying provision that the claims, damages, losses, or expenses that may be subject to indemnification must be "caused in whole or in party by any negligent act or omission" of the subcontractor. *Id.* The language of the contract raises numerous questions for a trier of fact that cannot be resolved on summary judgment. Accordingly, UTM's motion for summary judgment that it is entitled to indemnification by subcontractors Bingham, Siemens, and Diamond will be denied.

## 11. Ballard's Claim Regarding Limitation Of Liability Clause In Contract With Sahara

The Sahara's contract with Ballard included a limitation of liability clause, proposed by Ballard. Ex. A to *Hansen Aff,* Dkt. 298-3. Under this clause, Ballard's

liability for negligent acts, errors, or omissions, was not to exceed the greater of $50,000 or the total amount of its fee for engineer services. Ex. A to *Hansen Aff.*, Dkt. 298-3. According to Sahara's Scott Smith, who executed the fee proposal with Ballard, Smith returned a fully executed copy of the proposal to Ballard's Steve Franz, clarifying the basis for payment and raising the limitation of liability to $1,000,000.00. Ex. 2 to *Counsel Aff.*, ¶ 3, Dkt. 349-5. Ballard challenges the validity of Sahara's subsequent unilateral change of the liability limitation provision.

For terms of a contract to be upheld, there must be a meeting of the minds as to that term. *Potts Constr. Co. v. N. Kootenai Water Dist.*, 116 P.3d 8, 11 (Idaho 2005) (noting that proof of a meeting of the minds as to offer and acceptance must evidence mutual understanding and assent by both parties, to the terms of the agreement). It is apparent that no meeting of the minds occurred regarding the limitation of liability clause in the contract between Ballard and Sahara. Genuine issues of material fact remain regarding the validity of either party's proposed limitation of liability clause. Accordingly, Ballard's motion for partial summary judgment on this issue will be denied.

## 12. Siemens' Motion Against Mountain View – Remaining Issues

### A. Breach of Contract Issues

#### (1) *Items 12-14 from Townsend Report*

Siemens moves for summary judgment regarding Mountain View's breach of contract claim with respect to items 12-14 identified in the report of Mountain View expert, Bradley Townsend. *Townsend Rept.*, Ex. L to *Counsel Dec.*, Dkt. 257-26. These three items address the smoke evacuation system, the air pressure control system, and the

constant air flow system. Siemens asserts that the systems or system changes identified in items 12-14 concern issues of design rather than Siemens' contractual obligation to comply with specifications. *Siemens Mem.* Dkt. 257-1 at 14. In support, Siemens cites to reports and deposition testimony by Mountain View expert Locke. *See Locke Report*, Ex. H to *Counsel Dec.* (¶ 8), Dkt. 257-22; *Locke Dep.* at 1217-34, Ex. E to *Counsel Dec.* (¶5), Dkt. 257-11; *Locke Dep.* at 1233-34, 1249-52, Ex. E to *Counsel Dec.* (¶ 4).

Mountain View notes that it has not directly sued Siemens with respect to the smoke evacuation system; rather, Mountain View has sued Sahara. Mountain View does not address items 13 or 14 in its responsive brief. The Court notes that Mountain View's breach of contract claim against Siemens identifies only the maintenance contract between Mountain View and Siemens. However, it was Encompass – and not Mountain View – that contracted with Siemens to furnish and install controls for the mechanical system. Ex. C to *Counsel Aff.*, ¶ 4, Dkt. 159-5.

Given this record, there is no disputed issue of material fact with regard to whether Siemens is liable to Mountain View for a breach of contract concerning items 12-14. Thus, Siemens' motion for summary judgment on these issues will be granted. However, the Court's decision does not address the further issue of Sahara's possible liability regarding the smoke evacuation system.

### (2) *Alleged excess energy costs*

Mountain View claims that Siemens breached their obligations under the maintenance agreement by failing to prevent excessive energy costs. Siemens contends, that its agreement with Mountain View did not promise a particular level of energy

performance. *Siemens Mem.*, Dkt. 257-1 at 14-19. However, the maintenance agreement does include representations that can be construed as guaranteeing some level of performance. For example, the introductory summary provides that Siemens' "semi-annual visits [are] designed to ensure peak functionality" and to "maintain [a] high degree of efficiency and operating stability." *First Maint. Agr.*, Ex. C to *Counsel Dec.*, Dkt. 257-9 at 3; *see also Second Maint. Agr.*, Ex. D to *Counsel Dec.*, Dkt. 257-10. Another provision indicates that the "Proposal Benefits" include "increase[d] energy efficiency of Mountain View . . . due to optimized control systems." *Id.* at 6. Yet another promised benefit of the agreement is that it will "increase patient/staff satisfaction and decrease patient/staff complaints due to more efficient operation of the mechanical heating and cooling equipment." *Id.*

To be sure, the Court cannot find that the agreement imposes an unambiguous obligation to attain a certain level of performance. On the other hand, the Court is also unable to ignore the language in the contract, quoted above, which indicates that some level of performance will be obtained. Although this language is in the "Proposal" rather than the "Terms and Conditions" section of the maintenance agreements, the very signature page of the maintenance agreements indicates that Siemens "shall provide the services as outlined in the attached proposal . . . and the attached terms and conditions." *First Maint. Agr.*, Dkt. 257-9 at 14; *Second Maint. Agr.*, Dkt. 257-10 at 11.

The contract clearly suggests that Siemens' performance of its obligations under the contract will result in a "high degree of efficiency and operating stability," "increased energy efficiency," and "more efficient operation." What it fails to do is define a

measurable level of efficiency and stability. Without such measurable standards, the contract creates an ambiguity as to whether this language is a guarantee of performance under a standard not stated in the contract, or is simply a joint statement of the parties' objectives in entering into the maintenance agreement. The maintenance agreement lends itself to either interpretation, and both are reasonable – hence, the ambiguity.[10]

For this reason, the Court finds that there are disputed issues of fact with regard to what the parties intended in including these provisions in their contract. Accordingly, Siemens' summary judgment motion regarding Mountain View's breach of contract claim due to excessive energy costs, will be denied.

### (3) *Alleged non-compliance with specification requiring program for supply air temperatures*

Mountain View also claims that Siemens breached the maintenance agreement by failing to satisfactorily implement a program for supply air temperatures. Siemens denies that its agreement with Mountain View required anything more than compliance with the express language of the specifications. *Siemens Mem.*, Dkt. 257-1 at 14-19. On this issue, the Court will reconsider its decision in its initial Order (Dkt. 398). Mountain View acknowledges that the "literal language" of its maintenance agreement

---

[10] In concluding that the maintenance agreement is ambiguous, the Court is mindful of Siemens' argument that the maintenance agreement cannot be construed as providing any guarantee of energy performance, since performance contracts are a "well-known category of construction contracts," which are "complex document[s] resulting from negotiations over extremely detailed terms." *Siemens Reply,* Dkt. 326 at 6. The existence of such performance contracts in the industry and the lack of "extremely detailed" standards in the maintenance agreement, may provide compelling, perhaps even conclusive, evidence at trial that the parties did not intend to enter into such an agreement. However, such evidence only underscores the ambiguity of the contract.

"technically" requires only that Siemens implement a program for air supply temperatures. *Mountain View Resp.*, Dkt. 287 at 16. Having literally complied with the express language of the specifications, Siemens argues it cannot be found to have breached its contractual obligation. *See Counsel Dec., ¶¶ 6, 9* (Exs. F at UTM2-1281 to 1298, Ex. I at 5), Dkt. 257-3.

Mountain View counters that Siemens failed to comply with the intent of the specifications regarding supply air temperature, thus leaving a question of fact for trial as to whether Siemens is liable for breach of contract. However, unlike the excess energy costs claim, there is no language in the agreement suggesting that Siemens' obligation included anything more than fulfilling the contract's specifications.

In responding to Siemens' motion, Mountain View cites deposition testimony by its energy experts Henny van Lambalgen and Mike Locke. Although the experts' testimonies demonstrate there are a variety of methods for programing supply air temperatures, they fail to establish a question of fact regarding whether Siemens breached its agreement by failing to comply with the contract specifications. The existence of alternative programs advocated by Mountain View's two experts only suggest that the contract specifications might have been accomplished in more than one way. They do not suggest that Siemens failed to satisfy the literal requirements of the contract.

The Court therefore reconsiders its initial decision finding that material issues of fact remain for trial, and will grant Siemens' motion for summary judgment dismissing Mountain View's breach of contract claim as to compliance with specifications for a supply air temperature program.

#### (4)     *Pre-judgment interest*

Under Idaho law, an award of pre-judgment interest is limited to certain circumstances, including where a claim is for a liquidated sum. I.C. § 28-11-104. Siemens asserts that this provision limits damages available to Mountain View, in its claims for excess energy costs; thus, Siemens is entitled to summary judgment precluding pre-judgment interest. Mountain View counters that the law of Illinois, and not Idaho, applies here; under Illinois law, pre-judgment interest may be available. *See Oak* Park, 678 NE.2d 723, 727 (Ill. Ct. App. 1997). In any event, Mountain View argues, summary judgment on this issue is premature because no fact-finder has yet determined that Mountain View is entitled to energy costs. The Court agrees that this issue is best left until after an award of energy costs, if any, is rendered by a jury in this case. The court will therefore deny Siemen's motion on this issue without prejudice.

### B.     Siemens' Motion to Supplement and Mountain View's Motion to Strike

For its decision here, the Court did not rely on Siemens' Reply or attachments thereto, which are the subjects of Siemens' Motion to Supplement (Dkt. 351) and Mountain View's Motion to Strike (Dkt. 352). Those motions will therefore be deemed moot.

### 13.     Mountain View Claims Soffits Were Defective As-Built, And Wall At Entry's Fire Rating Was Not To Specifications

Mountain View seeks summary judgment on the issue of whether the hospital's soffits[11], as built, were defective. However, E.K. Bailey disputes that the soffit construction was defective, arguing that any defect was in design. Mountain View's primary concern with the soffits is the "inadequate barrier preventing cold air from blowing through the openings of the soffits." *Mountain View Mem.*, Dkt. 300 at 12. In support of its motion, Mountain View cites the report of Davis's expert, Steve Turney, which indicates that the "unsatisfactory performance" regarding airflow at the soffits wa "caused by construction not conforming to the Davis Partnership drawings and specifications." *Turney Rept.* at 6, Dkt. 302-12. But according to the report by E.K. Bailey's expert Donald Schellberg, the problem in construction at soffit areas is a "lack of a continuous air/vapor barrier, which is not detailed in the drawings . . . the as built condition reflects the deficiently designed detail and is a primary source of the air leakage into the building's interior." *Schellberg Resp. Rept.* at 12, Ex. M to *Counsel Dec.*, Dkt. 302-13 at 25; *see also Espinoza Dep.*, Ex. A to *Counsel Aff.*, Dkt. 341 at 10 (E.K. Bailey representative's testimony that the wall was built exactly how it was drawn).

Given the conflicting expert reports as to whether the soffit defect is with its construction or design, it is clear that there is a disputed issue of fact. Accordingly, the Court will deny Mountain View's motion for summary judgment on this issue.

---

[11] The soffit area is generally, and somewhat un-technically, the area below a roof where it meets the wall.

Mountain View also seeks summary judgment on the issue of whether a wall at the hospital's entry met the contract's fire rating specifications. Again, the Court is confronted by a classic "battle of the experts." Davis's expert Turney states that walls to the hospital's exterior "are required to be constructed with not less than 2-HR fire-resistive construction." *Turney Rept.* at 6, Dkt. 302-12. However, according to E.K. Bailey's expert Schellberg, the construction documents for walls at the hospital's entry called for the walls "to be constructed as one hour rated walls . . . As such, the walls and door penetrations were constructed as shown and/or detailed by the construction documents by Davis." *Schellberg Rept.* at 7, Dkt. 302-13 at 20. The Court must again find that triable issues of fact remain regarding whether entry/exit walls were to specifications as to fire rating. Accordingly, Mountain View's motion for summary judgment on these issues will be denied.

## SUMMARY OF DECISION BY ISSUE

The Court makes the following findings consistent with the above memorandum decision. Where inconsistent with the Court's initial Order (Dkt. 398), the Court's reconsideration or correction is noted:

1. Assignment of Design-Build Contract

    a. The Design-Build contract was validly assigned to Mountain View; in any event, Sahara is estopped from asserting otherwise. Accordingly, summary judgment is granted to Mountain View and denied to Sahara on this issue.

    b. Mountain View is not precluded form recovering attorney fees provided by the contract. Sahara's motion for summary judgment on this issue is denied.

2. Indemnification of Encompass by UTM

   a. Under Encompass's valid and unambiguous Contract Assumption Agreement with UTM, UTM must fully indemnify Encompass. Summary judgment is therefore granted to Encompass and denied to UTM on this issue.

   b. The Bankruptcy Court's Orders were not inconsistent with the Contract Assumption Agreement. Summary judgment on this issue is granted to Encompass and denied to UTM.

   c. UTM assumes Encompass's defenses as well as its liabilities. UTM's motion for summary judgment on this issue is granted.

   d. Sahara is not precluded from bringing claims for indemnification and breach of warranty against Encompass. Thus, Encompass's motion to dismiss Sahara's claims is denied. However, as noted below, those claims were discharged in bankruptcy.

   e. The Court did not find it necessary to consider the Van Taylor Affidavit. The motion to strike that affidavit is therefore denied as moot.

3. Discharge of Claims Due to Encompass's Bankruptcy

   a. Sahara was not a known creditor, thus notice of Encompass's bankruptcy to Sahara by publication was sufficient, and Sahara's claims against Encompass were discharged in bankruptcy. Encompass's motion for summary judgment on this issue is granted; Sahara's claims against Encompass is dismissed.

b. However, UTM's indemnification obligations, and its liability under Encompass's contracts, were not affected by Encompass's discharge because they were expressly approved by the Bankruptcy Court in the reorganization plan and therefore survived Encompass's discharge in bankruptcy. Thus UTM's motion for summary judgment on this issue is denied.

4. Economic Loss Rule

   a. The economic loss rule applies to Sahara's negligence claims against E.K. Bailey. The motion for summary judgment by E.K. Bailey is granted on this issue.

   b. The special relationship exception to the economic loss rule does not apply to Sahara, thus the economic loss rule applies to Mountain View's negligence claims against Encompass, Sahara, and Siemens, and those claims are dismissed. Motions for summary judgment by Sahara, Encompass, and Siemens are granted on this issue.

   c. The Court did not find it necessary to consider declarations by Vincent or Erickson. The motion to strike those declarations is denied as moot.

5. Statutes of Limitations for Breach of Contract Claims

   a. The statute of limitations for oral contracts does not apply. Mountain View's motion for summary judgment on this issue is denied.

   b. The statute of limitations for professional malpractice does not apply. Ballard's motion for summary judgment against Mountain View and Sahara is denied on this issue.

c. Mountain View timely filed its Complaint under the applicable statute of limitations. Sahara's motion for summary judgment barring Mountain View's contract claims under the statute of limitations is denied.

d. Encompass's breach of contract claim against Bingham is barred under the statute of limitations. Bingham's motion for summary judgment on this issue is granted.

e. Sahara's breach of contract claims against Encompass, UTM, and E.K. Bailey are barred under the statute of limitations; equitable estoppel is not satisfied. Summary judgment motions are granted to Encompass, UTM, and E.K. Bailey, and denied to Sahara, on this issue. This does not preclude Sahara from seeking indemnification or contribution against these parties, but such claims would be limited to amounts Sahara is deemed to owe Mountain View.

f. Disputed issues of fact remain regarding the nature of Mountain View's maintenance agreement with Siemens – specifically as to when the applicable statute of limitations accrued. Siemens' motion for summary judgment is denied on this issue.

6. Statute of Limitations for Tort Claims

Sahara's negligence claims against Encompass and UTM are barred by the statute of limitations. Summary judgment motions are granted to Encompass and UTM, and denied to Sahara on this issue.

7. Statute of Limitations for Indemnity and Contribution Claims

a. Sahara's indemnity claims against UTM and E.K. Bailey have yet to accrue and are thus not barred by the statutes of limitations. Motions for summary judgment are denied to UTM and E.K. Bailey on this issue. (Sahara's indemnity claim against Encompass, also not barred by the statute of limitations, was already found to have been discharged in bankruptcy.)

b. Indemnity claims by UTM and Encompass against Bingham are not barred by the statute of limitations. Motions for summary judgment by UTM and Encompass are therefore be granted on this issue.

8. Waiver, Laches, and Estoppel

a. Sahara has not asserted claims against Bingham, thus laches, waiver, and quasi-estoppel are not applicable. Bingham's motion for summary judgment on this issue is denied on this issue.

b. Bingham has not established that quasi-estoppel or waiver apply to preclude UTM's or Encompass's claims for contribution and indemnity against Bingham. Bingham's motion for summary judgment on these issues is also denied.

c. Disputed issues of fact remain whether laches applies to UTM's and Encompass's claims for contribution and indemnity against Bingham. Bingham's motion for summary judgment is denied, as Bingham has not shown it is entitled to dismissal as a matter of law on this issue. Genuine issues of material fact remain whether Mountain View had notice of its rights under its maintenance contracts with Siemens, so as to have waived a

breach of contract claim for excessive energy costs. Siemens' motion for summary judgment on this issue will therefore be denied.

d. Genuine issues of material fact remain whether damages from excessive energy use are quantifiable or measurable so as to satisfy requirements for express waiver. Siemens' summary judgment motion on this issue will also be denied.

e. Genuine issues of material fact remain whether damages sought by Mountain View against UTM for breach of contract are consequential or direct. UTM's motion for summary judgment on this issue is denied.

f. Genuine issues of material fact remain whether Mountain View or Sahara had notice or knowledge of a right they intentionally relinquished, required for laches, or waiver; also, genuine issues of material fact remain whether Mountain View and Sahara are asserting rights inconsistent with prior positions, required for the defense of quasi-estoppel. Therefore, UTM's motion for summary judgment on these issues is denied.

9. The Court reconsiders its prior finding regarding the nature of defense costs potentially owed to Sahara by Davis. Davis's motion for summary judgment on this issue will be granted.

10. UTM is entitled to indemnification by Bingham, Siemens, and Diamond, but whether there is anything to be indemnified is an issue to be resolved at trial. Thus, UTM's motion for summary judgment on this issue is denied.

11. Genuine issues of material fact remain regarding the validity of Ballard's and Sahara's proposed limitation liability clauses. Ballard's motion for summary judgment on this issue is denied.

12. Siemens' Motion Against Mountain View

   a. Siemens is not liable to Mountain View regarding items 12-14 in the Townsend Report. Siemens' motion for summary judgment dismissing Mountain View's breach of contract claims will therefore be granted. The Court corrects an error in its prior decision, and here clarifies that item 12 in the Townsend Report concerns the smoke evacuation system; the Court confirms that Siemens' motion on this issue is granted.

   b. The Court inadvertently omitted its finding on Siemens' motion as to its liability for breach of contract regarding excess energy costs. Consistent with the Court's memorandum decision above, Siemens' summary judgment motion on this issue will be denied.

   c. The Court reconsiders its prior finding regarding compliance with specifications for programming supply air temperature. Siemens did not breach its contractual obligation on this issue. Siemens' summary judgment motion on this issue will be granted. Siemens' motions to supplement and Mountain View's motion to strike are moot.

   d. Siemens' motion to supplement and Mountain View's motion to strike are moot.

e.  Siemens' motion for summary judgment regarding pre-judgment interest is premature.  Siemens' motion on this issue is denied without prejudice.

13.    Genuine issues of material fact remain whether soffits were defective, and whether entry walls were to specifications regarding fire rating.  Mountain View's motion for summary judgment on these issues is denied.

## ORDER

Consistent with the Court's memorandum decision above, **IT IS ORDERED THAT:**

1.  Encompass's Motion for Summary Judgment (Dkt. 159) is GRANTED.  All claims against Encompass are dismissed.

2.  Ballard's Motion for Summary Judgment (Dkt. 162) is DENIED.

3.  Bingham's Motion for Summary Judgment (Dkt. 163) is GRANTED in part, and DENIED in part.

4.  E.K. Bailey's Motion for Summary Judgment (Dkt. 169) is GRANTED in part, and DENIED in part.

5.  Sahara's Motion for Summary Judgment (Dkt. 225) is GRANTED in part, and DENIED in part.

6.  Siemens' Motion for Summary Judgment (Dkt. 257) is GRANTED in part, and DENIED in part.  The Court has reconsidered specific findings with respect to this Motion, as reflected in its memorandum decision above.

7.  UTM's Motion for Summary Judgment (Dkt. 292) is GRANTED in part, and DENIED in part.

8. The Court's finding in its initial Order (Dkt. 398) denying Davis's Motion for Summary Judgment (Dkt. 297) is VACATED. On reconsideration, initiated by the Court, Davis's Motion for Summary Judgment (Dkt. 297) is GRANTED.

9. Ballard's Motion for Summary Judgment (Dkt. 298) is DENIED.

10. Mountain View's Motion for Summary Judgment (Dkt. 299) is GRANTED in part, DENIED in part.

11. Encompass's Motions to Strike (Dkts. 280 and 390) are DENIED as MOOT.

12. Siemens' Motion to Supplement, (Dkt. 331) is DEEMED MOOT.

13. Mountain View's Motion to Strike (Dkt. 352) is DENIED as MOOT.

DATED: October 17, 2011

B. Lynn Winmill
Chief Judge
United States District Court